# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

GEORGIA TECH RESEARCH
CORPORATION,

     *Plaintiff,*

  v.

    Civil Action No. 1:24-cv-05268-JPB

MURATA ELECTRONICS NORTH
AMERICA, INC. and MURATA
MANUFACTURING CO., LTD.,

     *Defendants.*

## DEFENDANT MURATA ELECTRONICS NORTH AMERICA, INC., AND DEFENDANT MURATA MANUFACTURING CO., LTD.'S RULE 12(b)(6) MOTION TO DISMISS AND SUPPORTING MEMORANDUM

# **TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................1

II.  BACKGROUND ..................................................................................2

III.  LEGAL STANDARD ..........................................................................4

  A.  Motion to Dismiss..............................................................................4

  B.  Patent Eligibility ...............................................................................4

IV.  ARGUMENT.......................................................................................7

  A.  The '914 Patent is Ineligible Under 35 U.S.C. § 101.......................7

    1.  Claim 1 .........................................................................................8

    2.  Claims 2 and 12...........................................................................19

    3.  Claim 11 .......................................................................................20

    4.  Claims 13 and 15.........................................................................21

    5.  Claim 14 and 16..........................................................................22

  B.  GTRC's Contributory Infringement Claim Should be Dismissed. ..............23

V.  CONCLUSION...................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018) ...........................................................6

*Alice Corp. Pty. v. CLS Bank Int'l*,
    573 U.S. 208 (2014)......................................................... 1, 4, 5, 7, 8, 15, 19, 25

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
    967 F.3d 1285 (Fed. Cir. 2020) ........................................ 5, 7, 13, 14, 18, 19, 21

*Application of Gelnovatch*, 595 F.2d 32 (C.C.P.A. 1979)........................................3

*ChargePoint, Inc. v. SemaConnect*,
    920 F.3d 759 (Fed. Cir. 2019) ...........................................................9

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
    880 F.3d 1356 (Fed. Cir. 2018) ..........................................................16

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
    815 F. App'x 529 (Fed. Cir. 2020) ...............................................7, 17

*Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*,
    958 F.3d 1178 (Fed. Cir. 2020) ..........................................................15

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) .......................................................5, 8

*INO Therapeutics LLC v. Praxair Distribution Inc.*,
    782 F. App'x 1001 (Fed. Cir. 2019) ...........................................6, 10, 12, 13, 15

*Iqbal*, 556 U.S. 662, 678 (2009) ...............................................................4

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018) ..........................................................14

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
    566 U.S. 66 (2012)..............................................................................12

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) ...............................................................5

*Merrill Mfg. Co. v. Simmons Mfg. Co*.,
    553 F. Supp. 3d 1297 (N.D. Ga. 2021) .............................................23, 24

*Nat. Alternatives Int'l, Inc. v. Creative Compounds, LLC*,
    918 F.3d 1338 (Fed. Cir. 2019) ........................................................6, 12

*Secured Mail Sols. LLC v. Universal Wilde, Inc*.,
    873 F.3d 905 (Fed. Cir. 2017) ..............................................................16

*In re TLI Commc'ns Pat. Litig*,
    823 F.3d 607 (Fed. Cir. 2016) ................................................................5

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ................................................................4

*Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd*.,
    887 F.3d 1117 (Fed. Cir. 2018) .......................................................11, 12

*Yu v. Apple Inc*.,
    1 F.4th 1040 (Fed. Cir. 2021) ................................................................8

**Statutes**

35 U.S.C. § 271(c) ....................................................................................23, 24

## I.    INTRODUCTION

When properly drafted, patents serve a good and worthy function of rewarding scientific inventions. However, some patents are drafted so broadly that the claims preempt "the basic tools of scientific and technological work." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). And that is the case here, with respect to U.S. Patent No. 7,489,914 (the "'914 Patent"). Indeed, the asserted claims of the '914 Patent—irrespective of any alleged novelty or non-obviousness—are drafted so broadly that they preempt the basic tools of invention and scientific discovery with respect to simple circuitry in radio frequency ("RF") devices. And the object of 35 U.S.C. § 101 is to prevent such abuses. As explained herein, when dealing with claims such as those in the '914 Patent that are highly reliant on discoveries of naturally occurring correlations, natural phenomena, and laws of nature, a key aspect of the § 101 inquiry is the breadth of the claims. Claims that recite **specific** inputs that yield **specific** desired results ***based on the correlation*** are eligible for patent protection. In contrast, claims that purport to cover ***all*** embodiments that take advantage of the natural correlation effectively amount to a claim on the correlation itself. Such claims are not eligible.

Not only are the claims ineligible under § 101, but the Court should also dismiss the Complaint for another independent reason. GTRC's Complaint fails to state a claim for relief for contributory infringement.

## II.    BACKGROUND

Georgia Tech Research Corporation ("GTRC") "does not itself commercialize intellectual property." Complaint, ¶ 5. Rather, it is "the contracting entity for all sponsored activities for [Georgia Tech]." Complaint, ¶¶ 2-3. At best, GTRC conducted research, and through this research it purports to have been the first to discover and certain naturally occurring correlations in the field of RF devices. To understand how GTRC's claims preempt basic scientific principles in multi-band RF devices, it is important to first understand what those scientific principles are.

"Impedance" is the measure of how much a circuit resists the flow of current. It is an inherent property in any circuit (similar to how voltage and resistance are inherent properties of a circuit or circuit components). Anything that outputs a signal has an "output impedance." "Impedance matching" is the practice of matching the impedance of a device (e.g., a resistor)—i.e., the "load impedance"—to the "output impedance" of a power source based on the law of nature that the maximum power will be transferred from a power source to a device when the load impedance matches the output impedance. Passive networks (e.g., resistors, capacitors, inductors) can be specifically configured to provide "impedance matching" in RF devices.

2

Additionally, there is also a mathematical correlation between frequency and impedance in RF devices. In simple terms, a change in frequency results in a change in impedance for passive networks in RF devices. This is also a well-known concept. *See Application of Gelnovatch*, 595 F.2d 32 (C.C.P.A. 1979) (finding a patent covering the mathematical equations relating in part to "input-output impedance versus frequency" to be ineligible under 35 U.S.C. § 101).

Finally, it is a fundamental principle of circuitry that device performance is correlated to the materials and components used therein. In circuitry, reference is often made to the term "quality factor (Q)." *See e.g.*, '914 Patent, 2:62. "High-Q" components are desirable in circuits due to their ability to produce desired results in devices, such as low noise or good power transfer. '914 Patent, 18:9-11 ("The phase noise figure of an oscillator is inversely proportional to the quality factor (Q) of the oscillator's resonator and the power consumption of the oscillator"). A Q-Factor of a component is an inherent property of that specific component. The '914 Patent ***specification*** purports to disclose research observations about certain correlations observed between the performance of RF devices using specific high-Q passive devices (resistors, inductors, capacitors, etc.) in specific configurations using certain specific organic-based substrates—such as certain specific liquid crystal polymers ("LCPs").[1] However, as explained herein, the claims are drafted broadly to include

---

[1] Notably, "LCP" is not a specific material, but rather a broad category of materials.

much more than these specific configurations, and indeed are drafted so broadly that they preempt any use of the observed correlation not matter how implemented. Thus, they are not eligible for patent protection.

## III.    LEGAL STANDARD

### A.    Motion to Dismiss

To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." The Court is not bound to accept as true a legal conclusion masquerading as a factual allegation. *Id.* at 678.

### B.    Patent Eligibility

As the Supreme Court has explained, § 101 denies a patent to some types of inventions that seek to monopolize the "building blocks of human ingenuity." *Alice*, 573 U.S. at 216. For this reason, claims directed to "[l]aws of nature, natural phenomena, and abstract ideas" are "patent-ineligible." *Id.* at 216-17. Patents that do not claim patent-eligible subject matter are invalid and complaints asserting such patents fail to state a claim for relief and should be dismissed. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 711-12 (Fed. Cir. 2014). Courts analyze patent-eligibility under § 101 using the two-step *Alice* framework. *Id.* at 216-226.

4

At Step One, courts determine what the claims are "directed to." *Id*. at 216, 225. In so doing, courts look to the "focus" of the claims. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). And, viewing the claims "as a whole," courts determine "whether the claims [] focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect . . . and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). If the court concludes that the claims are directed to patent-ineligible subject matter, the inquiry proceeds to *Alice* Step Two. *Alice*, 573 U.S. at 221.

At Step Two, courts determine whether a claim directed to patent-ineligible subject matter nonetheless contains an "inventive concept" sufficient to "transform the nature of the claim into a patent-eligible application." *Id*. at 217. For a claim to contain an "inventive concept," it must comprise more than the recitation of "well-understood, routine, and conventional activities previously known in the industry." *Id*. at 225 (internal quotations omitted); *see also In re TLI Commc'ns Pat. Litig*, 823 F.3d 607, 615 (Fed. Cir. 2016).

There are relatively few § 101 cases dealing with preemption of laws of nature and natural phenomena, at least when compared with cases dealing with abstract ideas. *See Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1296 (Fed. Cir. 2020) (noting that most of the relevant authority for § 101 comes from

"abstract idea" cases). However, a common thread between in the Federal Circuit's recent "laws of nature" and "natural phenomena" cases is the focus on the "*specificity* required to transform [the] claim from one claiming only a result to one claiming a way of achieving it." *Id.* (emphasis added) (quoting *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018)); *see INO Therapeutics LLC v. Praxair Distribution Inc.*, 782 F. App'x 1001, 1007-09 (Fed. Cir. 2019) (citing *Nat. Alternatives Int'l, Inc. v. Creative Compounds, LLC*, 918 F.3d 1338 (Fed. Cir. 2019)). That is, when the claim purports to make use of a natural correlation, the Federal Circuit has looked to whether the claim includes "specific" inputs to achieve "specific" desired outputs or whether the claim attempts to broadly cover any implementation of the correlation, which "collapses into a claim focused on the natural phenomenon." *INO*, 782 F. App'x at 1007; *see also Natural Alternatives*, 918 F.3d 1338 (Fed. Cir. 2019).

*"[T]he ultimate determination of eligibility under § 101 is a question of law."* *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) (emphasis added). "[L]ike many legal questions, there can be subsidiary fact questions which must be resolved *en route* to the ultimate legal determination." *Id.* For example, whether a claim element is "well-understood, routine, and conventional to a skilled artisan" is ordinarily a question of fact. *Id.* But "[a]ny allegation about inventiveness, wholly divorced from the claims or the

specification" does not defeat a motion to dismiss; only "plausible and specific factual allegations that aspects of the claims are inventive are sufficient." *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) (quoting *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019)).

## IV.    ARGUMENT

### A.    The '914 Patent is Ineligible Under 35 U.S.C. § 101

The claims of the '914 Patent are so broad that they preempt "the basic tools of scientific and technological work." *Alice*, 573 U.S. at 216. GTRC has claimed ***all*** multi-band RF applications that utilize basic and well-known circuitry principles such as impedance matching, the correlation between frequency and impedance, and the correlation between the properties of ***all*** organic materials and RF device performance. Viewing the extreme breadth of these claims, what GTRC tries to preempt with its claims is not a specific ***means*** of producing a result, it is preempting the use of the correlation that produces the result, effectively monopolizing the result itself. The limitations of the claims amount to no more than describing a device that implements impedance matching, varying impedance with frequency, and using materials that maximize performance "by whatever structures or steps happen to work." *American Axle*, 967 F.3d at 1295. The lack of "a specific means or method that improves the relevant technology" means that the claims are ineligible.

### 1.    Claim 1

#### a.    *Alice* Step One

At Step One, the Court considers what the claims are "directed to" by looking to the "focus" of the claims. *Elec. Power Grp.*, 830 F.3d at 1353. Viewing claim 1 as a whole, it is directed to the non-specific application of basic circuitry principles and laws of nature: impedance matching, correlation between impedance and frequency, and the inherent, naturally occurring properties of organic-based substrates. On its face, claim 1 appears to be a loose, generic recitation of physical components making up an RF device. In this regard, claim 1 is similar to those the Federal Circuit found to be ineligible in *Yu v. Apple*. The claims in *Yu* generally covered "[a]n improved digital camera," and despite the claim limitations almost exclusively comprising "tangible components" of the camera, the Federal Circuit concluded that these components did nothing more than provide "a generic environment in which to carry out [an] abstract idea." *Yu v. Apple Inc*., 1 F.4th 1040, 1042-44 (Fed. Cir. 2021). Like in *Yu*, claim 1 recites an assortment of generic components for an RF device: (1) an active device, (2) passive networks including matching networks, and (3) a substrate. However, all of these are just generic components and there is no specific configuration recited that is the "focus" of the claims.

An "active device" is an electronic component capable of amplifying electrical signals—i.e., a transistor. The first and second "passive network[s]" are networks of passive devices such as resistors, capacitors, and inductors—claimed in no specific configuration. A "matching network" is simply the network of passive devices designed for impedance matching. A substrate is the material or structure upon which the RF device components are constructed. It is not simply a single block of material but rather comprises many layers that may be made of a variety of materials. Finally, the claim recites that the "impedances of the first and second passive networks are different at the first frequency than the second frequency." This is not a phrase that limits claim 1 in any significant way but rather merely recites a law of nature—impedance varies with frequency. All of these elements combined just make up a generic multi-band RF device. What then is the "focus" of the invention?

It is well-established that the "directed to" inquiry may involve looking to the specification to understand "the problem facing the inventor," which can elucidate what the claim is purporting to capture. *ChargePoint, Inc. v. SemaConnect*, Inc., 920 F.3d 759 (Fed. Cir. 2019). According to the specification, multi-band RF devices were well-known before the '914 Patent, but "[d]esigning multi-band, multi-mode devices such as RF transceivers presents some difficulties in power consumption, compatibility, interference, and integration." '914 Patent, 1:48-50. The patent and

Complaint both confirm that what is desired is to "provide impedance transformation for minimum [noise factor ("NF")] at the input and maximum power gain at the output." '914 Patent, 24:10-14; *see also* Complaint, ¶¶ 38-39.

Claim 1 does not recite any specific circuit topology in pursuit of this alleged goal. While the ***specification*** purports to "overcome [issues of power consumption, compatibility, interference, and integration] by describing multi-band, multimode integrated RF transceiver topologies," none of those specific topologies made it into claim 1. *See* '914 Patent, 2:8-10. Reading the claims in light of the specification, only two limitations in the claim purportedly contribute to optimizing multi-band RF performance: (1) impedance matching and (2) use of an organic-based substrate. However, the recitation of these limitations is not a specific means for solving the problem but instead is a "broad directive" to make use of well-known natural laws and natural phenomena, which "collapses into a claim focused on [the law of nature and] the natural phenomena" themselves. *INO*, 782 F. App'x at 1007.

Claim 1 simply requires having a first and second "matching network" in the abstract. But this is not a specific means for optimizing RF performance. Impedance matching, by definition, is the process of optimizing power output based on the natural law that highest power transfer occurs when the load impedance and output impedance are equal. But claim 1 is silent to any specific circuit configurations and simply covers the concept of impedance matching—regardless of the specific

implementation. Moreover, while the *specification* alleges that "[t]he use of high-Q . . . passives in organic substrates for implementing these matching networks results in lower NF and higher gain," *claim 1* does not recite any specific passives, organic material, or any specific configuration of the components and substrate. *See* '914 Patent, 24:14-16. In short, GTRC may have created a specific invention through its research—a specific application using specific passives and organic materials in a specific configuration—but such does not entitle it to all implementations of the applicable laws of nature and natural correlations regardless of the specific implementation.

Similar issues often arise in the medical context. Such cases are instructive here. Where a patent purports to have discovered a correlation between the use of a substance or material and a desired outcome from the use of that substance or material, the Federal Circuit has drawn a line between claims that relate to specific applications based on the correlation and claims that collapse into claiming the entire correlation itself. For example, in *Vanda*, the patent observed a "natural relationship between CYP2D6 metabolizer genotype and the risk of QTc prolongation," but the claims were found to be eligible because the claims recited "more than the natural relationship" and included "a *specific* method of treatment for *specific* patients using a *specific* compound at *specific* doses to achieve a *specific* outcome." *Vanda Pharms. Inc. v. W.-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1136 (Fed. Cir. 2018)

(emphasis added). Similarly, in *Natural Alternatives*, the observed a correlation between dietary supplements and an athlete's anaerobic working capacity, but the claims were eligible due to a recitation of "***specific dosages***" of supplement ***to obtain a specific benefit*** by "altering the subject's natural state." 918 F.3d at 1341, 1345–46 (emphasis added); *see also INO*, 782 F. App'x at 1008 ("The claim [in *Natural Alternatives*] used a particular dose of a substance to obtain a specific 'benefit' . . . ."). In contrast, in *INO Therapeutics*, "[t]he inventors observed a natural phenomenon about how the body reacts to iNO gas that appears to be relevant to . . . diseases." *INO*, 782 F. App'x at 1007. However, unlike *Vanda* and *Natural Alternatives*, the claims "stop[ped] well short of an improved treatment method" because they did not require "using an improved set of ***specific doses in light of this discovery***." *Id.* (emphasis added). In other words, the researchers observed a correlation: if this substance is ***generally*** applied in the human body, then there is a predictable ***general*** result based on a naturally occurring correlation. But without ***specific*** doses to obtain a ***specific*** result, the claims were not patent eligible. Claims that merely "tells [those] interested in the subject about the correlations that the researchers discovered" are not eligible. *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 78 (2012).

Claim 1 of the '914 Patent is similar to the claims in *INO*. Claim 1 effectively says if you employ impedance matching and if you ***generally*** use ***any*** organic-based

substrate—no matter what organic material, configuration of substrate layers, or circuit topology—then performance will *generally* improve. But that is no more than a *general* observation of laws of nature and natural phenomena. It is not a specific *means* of using those laws of nature and natural phenomena. Nowhere in the claims is there a recitation of a *specific* organic-based substrate with a *specific* configuration with a *specific* surface topology to yield a *specific* benefit. Like in *INO*, claim 1 of the '914 Patent is not merely claiming a new use of a known material, it is wholly preempting the correlation of between a whole class of materials and the general benefits that those materials confer to an entire industry regardless of the specific application. Thus claim 1 "collapses" into a claim on the laws of nature and natural phenomena themselves. *INO*, 782 F. App'x at 1007.

Claim 1 is also similar to those that the Federal Circuit confirmed were invalid in *American Axle*. In *American Axle*, the claims generally covered a method of manufacturing a shaft assembly. 967 F.3d at 1290. There was no question that the claims required an application of Hooke's law, which describes the natural correlation between frequency, mass, and stiffness. *Id.* at 1294. The issue before the court was whether the claims had "the *specificity* required to transform [the] claim from one claiming only a result to one claiming a way of achieving it." *Id.* (emphasis added) (quoting *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018)). At Step One, the Federal Circuit found that "considered as a whole" one of

the claims[2] was directed to the mere application of Hooke's law and that it claimed a result "without limiting the claim to **particular** methods of achieving the result." *Id.* at 1295 (emphasis added). That is, despite reciting an application of the law, the claims were "drafted in such a result-oriented way that they amount[] to encompassing 'the principle in the abstract' ***no matter how implemented."*** *Id.* at 1296 (emphasis added) (quoting *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018)). The Federal Circuit found that the same principles applied to laws of nature cases like *American Axle* where claims were so broad as to do no more than instruct "apply Hooke's law" to achieve a desired result. *Id.* at 1300.

The Federal Circuit's reasoning in *American Axle* is directly applicable to claim 1 of the '914 Patent which does no more than instruct to use any organic-based substrate with no particular configuration. There is no recitation of particular substrate materials or any configuration of those materials to achieve the desired result. The claim likewise instructs to use "matching networks," without any reference to the specific circuit topologies. In effect, it claims broad concepts "no matter how implemented," which is exactly why the claims in *American Axle* ran

---

[2] With respect to the other claim at issue in *American Axle*, the Federal Circuit found it "appropriate" to remand to the district court rather than deciding the eligibility because the appellee's position relied on "both the natural law and abstract idea categories of ineligibility in defending the district court's decision," but the "abstract idea basis was not adequately presented and litigated in the district court." *American Axle*, 967 F.3d at 1300-01. However, the Federal Circuit's refusal to defend the district court's decision with respect to the natural law arguments is telling.

afoul of § 101. *Id.* at 1296. If a claim purports to find a correlation existing in nature but does not recite a specific means of using that correlation, the claim "collapses" into claiming the correlation itself. *INO*, 782 F. App'x at 1007.

Claim 1 is too broad for patent protection. It does not just invoke fundamental circuitry principles and laws of nature. The entire claim collapses into a preemption of the using the laws of nature and natural phenomena ***by any means*** to achieve the desired result. Accordingly, claim 1 fails Step One.

### b.    *Alice* Step Two

At Step Two, there is nothing in claim 1 that qualifies as an "inventive concept" to transform it into patent eligible matter. All of the limitations of claim 1 are "specified at a high level of generality, [are] specified in functional terms, and merely invoke[] well-understood, routine, and conventional components and activity." *Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1183 (Fed. Cir. 2020).

All of the tangible components are common components that can be found in any RF device. That is, it is well-understood, routine, and conventional for multi-band RF devices to have "active devices," multiple "passive networks," "matching networks," and "substrates" upon which the circuit is built. There is nothing inventive about any of these limitations, alone or in combination. Similarly, the limitation "wherein impedances of the first and second passive networks are

different at the first frequency than the second frequency" is not only well-understood, routine, and conventional, it is a law of nature—impedance varies with frequency. Thus, this limitation cannot supply an inventive concept.

GTRC may argue that the use of an organic-based substrate, as opposed to an inorganic substrate is an "inventive concept," since its Complaint states that "[p]rior to the '914 Patent, multi-band RF devices utilized inorganic substrates" such as ceramics rather than organic substrates. Not only is this allegation is not found anywhere in the claims or specification, it is contradicted by the File History of the '914 Patent.[3] For example, U.S. Patent Application No. 10/402,313—which is the earliest application in the '914 Patent's priority chain—was originally rejected over Japanese Patent 09130103 to Endo, which discloses "using a standard organic multilayered substrate" for use in a "compact band pass filter." *See* Exhibit A, U.S. Application No. 10/402,313 File History, 09/08/2004 Non-Final Rejection, and attached translation of JP 09130103 A ("Endo") at Abstract. Additionally, the information disclosure statement submitted by the applicant during the prosecution of the '914 Patent cites multiple articles confirming that organic materials were widely used for printed circuit boards instead of ceramic prior to the filing of the '914

---

[3] The file history of the '914 Patent is intrinsic evidence that is properly considered at the Motion to Dismiss stage. *Secured Mail Sols. LLC v. Universal Wilde, Inc*., 873 F.3d 905, 912 (Fed. Cir. 2017); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc*., 880 F.3d 1356, 1365 (Fed. Cir. 2018).

Patent. Exhibit B, '914 Patent File History, 08/08/2005 Information Disclosure Statement; Exhibit C, SON, M.H., et al., "Low-Cost Realization of ISM Band Pass Filters Using Integrated Combine Structures," 2000, at Abstract; Exhibit D, MATIJASEVIC, G., et al., "MCM-L Substrates Fabricated Using Patterned TLPS Conductive Composites," 1997 International Conference on Multichip Modules, April 2, 1997, at Abstract; Exhibit E, ALVIN, L.S. Loke, et al. "Evaluation of Copper Penetration in Low-K Polymer Dielectrics by Bias-Temperature Stress," MRS Spring Meeting, Symp. N/O, Paper 04.4, 04/07/1999, at Abstract. GTRC cannot hide behind its unsupported, conclusory allegations in the Complaint that use of an organic substrate is new and inventive. Indeed, the file history of the patent shows that the use of organic-based materials were well-known and conventionally used for substrates in electrical applications. While the Court should ordinarily assume that well-pleaded facts in the Complaint are true, allegations in the Complaint concerning inventiveness "wholly divorced from the claims or the specification" does not defeat a motion to dismiss; only "plausible and specific factual allegations that aspects of the claims are inventive are sufficient." *Dropbox*, 815 F. App'x at 538.[4]

---

[4] Murata also disagrees that the '914 Patent is new and non-obvious, but that disagreement is not at issue in this brief—it is the subject of two petitions for inter partes review ("IPR") of the '914 Patent currently before the Patent Trial and Appeal Board.

However, even if the GTRC was the first to discover or use organic materials for multi-band RF devices—they were not—such a discovery does not give them the right to monopolize all uses of ***all*** organic materials in all multi-band RF applications regardless of what organic materials are used and regardless of how they are implemented. Again, *American Axle* is instructive in this instance. Under Step Two, the Federal Circuit explained that there was no inventive concept in the claims because "[t]he real inventive work lies in figuring out ***how*** to design a liner to damp two different vibration modes simultaneously, and no such inventive work is recited in claim 22." *American Axle*, 967 F.3d at 1299 (emphasis added). With respect to claim 1 of the '914 Patent, the "real inventive work" lies in figuring out ***how*** to construct the circuit networks, how to construct the organic-based substrate,[5] and ***what specific organic material*** to include in the substrate to optimize the RF device. *See e.g.*, Exhibit E at Abstract (conducting research on six ***specific*** "low-κ organic polymer dielectrics"). While the specification purports to disclose specific topologies that achieve higher performance, those specific topologies are not claimed. The Federal Circuit has "repeatedly held that features that are not claimed are irrelevant as to step 1 or step 2 of the Mayo/Alice analysis." *American Axle*, 967

---

[5] A substrate comprises many layers. Indeed, the supposed "organic-based" substrates of the '914 Patent depict both organic- and inorganic-based layers. A very relevant question when it comes to actual implementation of the alleged invention—a question to which the claims are silent—is how to configure not just the components on the substrate, but how to configure the substrate itself.

F.3d at 1293. The **claims** must include a specific application of the natural correlation. Claim 1 simply does not do that.

Claim 1 collapses into a preemption of natural laws and natural phenomena because it is so broadly drafted. It preempts **any and all** multi-band devices, including **all** circuit configurations of **any** active device and passive components, using **all** organic-based substrates, the claims lack "the specificity required to transform [the] claim from one claiming only a result to one claiming a way of achieving it." *American Axle*, 967 F.3d at 1296 (quoting *SAP Am.*, 898 F.3d at 1167). Accordingly, it fails both steps of the *Alice* inquiry. Claim 1 is not eligible for patent protection as a matter of law, and thus GTRC's claims for patent infringement with respect to claim 1 should be dismissed.

### 2.    Claims 2 and 12

Claims 2 and 12 both fail to (1) shift the "focus" of the claims to eligible subject matter and (2) provide an inventive concept that transforms the claims into patentable matter. Claim 2 is directed to the exact same device as claim 1, but "wherein the first and second passive networks comprise resonant circuits, and wherein the impedances of the first and second networks comprise reactance." '914 Patent, claim 2. A "resonant circuit" is an electric circuit using circuit elements such as an inductor and capacitor to cause resonance at a specific frequency. The patent does not purport to have invented resonant circuits, nor does it propose any new and

improved configuration of a resonant circuit. This extra detail does nothing to alter the Step One and Step Two analysis above. Claim 12 is directed to the same device as claim 1, but "wherein the active device is a field effect transistor." '914 Patent at claim 12. A field effect transistor is a type of transistor that uses an electric field to control the current in the circuit. The patent does not purport to have invented field effect transistors, nor does it propose any new and improved use of a field effect transistor. This extra detail does nothing to alter the Step One and Step Two analysis above. Thus, for the same reasons as articulated above for claim 1, claims 2 and 12 are directed to patent-ineligible subject matter and lack an inventive concept. Accordingly, GTRC's claims for infringement of claims 2 and 12 should be dismissed for the same reasons as claim 1.

### 3.    Claim 11

Claim 11 fails to (1) shift the "focus" of the claims to patentable subject matter and (2) provide an inventive concept that transforms the claims into patentable matter. Claim 11 covers "claim 1, wherein the organic-based substrate comprises liquid crystalline polymer." '914 Patent at claim 11. As a preliminary matter, "liquid crystalline polymer" ("LCP") is not a specific material, but rather a class of materials. Thus, it is not as though claim 11 remedies the defects of claim 1 by providing a specific organic material. It does not. Rather, it has inched forward one degree of specificity, while still maintaining its broad directive over an entire class

of materials, regardless of the specific application. Claim 11, just as with claim 1, is so broadly written that it effectively preempts any use of an entire category of materials—no matter how made or configured—from an entire field of electronics. Ultimately, what is claimed is still a desired result—high power output and low noise—regardless of what LCP is used. But "the real inventive work" is figuring out which LCPs are suitable for substrates and which are not. *See American Axle*, 967 F.3d at 1299; *See e.g.*, Exhibit E at Abstract (conducting research on six **specific** "low-κ organic polymer dielectrics"). No such inventive work is recited in claim 11. Accordingly, since it does not remedy the defects of claim 1, claim 11 is likewise ineligible.

### 4.    Claims 13 and 15

Claims 13 and 15 also have the same "focus" as claim 1 and fail to provide an "inventive concept." Claims 13 and 15 are directed to the same device as claim 1, but "wherein the [first/second] passive network comprises a component embedded in the organic-based substrate." '914 Patent at claim 13, 15. GTRC did not invent the concept of embedding components of passive networks within a substrate, nor do the claims propose any new and inventive way of embedding components in a substrate. *See e.g.*, Exhibit F, MIN., S.H., et al., "Design, Fabrication, Measurement and Modeling of Embedded Inductors in Laminate Technology," ASME Int'l Elect. Pkg. Technical Conf, 2001, at Abstract ("In this paper, several planar **embedded**

21

inductors whose measured quality factors range from 20 to 90 were characterized in the frequency domain." (emphasis added)) This added detail does not alter the Step One or Step Two analysis above. Claim 11 recites no specific configuration of the embedded passives, but rather wholly preempts the use of a common circuitry technique as applied to the naturally existing properties of all organic substrates. Such a broad claim still runs headlong into the preemption concerns undergirding § 101, just as claim 1 does. Even if GTRC did discover that embedding passives in an organic substrate yields a lower NF and higher gain in LNAs, the result itself is not patentable. Thus, for the same reasons as articulated above for claim 1, claims 13 and 15 are directed to patent-ineligible subject matter and lack an inventive concept. Accordingly, GTRC's claims for infringement of claims 13 and 15 should be dismissed for the same reasons as claim 1.

### 5.    Claim 14 and 16

Claims 14 and 16 both fail to (1) shift the "focus" of the claims to patentable subject matter and (2) provide an inventive concept that transforms the claims into patentable matter. Claims 14 and 16 are directed to the same device as claim 1, but "wherein at least one of the metal layers is patterned to form at least a portion of the component included the [first/second] passive network." '914 Patent at claims 14, 16. Claim 1 already requires that "the two metal layers are patterned to form at least a portion of the of the first passive network and the second passive network." '914

Patent at claim 1. The only thing added by claims 14 and 16 is that the metal layer comprises a portion of the "component" of the respective passive network. This effectively does nothing to change the "focus" of the claims, nor does it add an "inventive concept." Thus, for the same reasons as articulated above for claim 1, claims 14 and 16 are directed to patent-ineligible subject matter and lack an inventive concept. Accordingly, GTRC's claims for infringement of claims 14 and 16 should be dismissed for the same reasons as claim 1.

### B. GTRC's Contributory Infringement Claim Should be Dismissed.

Even if the Court finds that the '914 Patent is not ineligible, the Court should still dismiss GTRC's Complaint in part with respect to its claim for contributory infringement because GTRC never alleges that Murata sells, offers to sell, or imports "a component of a patented machine." 35 U.S.C. § 271(c).

Contributory infringement generally pertains to situations where devices themselves do not infringe the patent but are designed to be a component of some other machine that is covered by the patent, and where the patented machine cannot operate without the accused component. *See* 35 U.S.C. § 271(c). Accordingly, it is not enough to allege that the patent covers a component of an accused device. *Merrill Mfg. Co. v. Simmons Mfg. Co.*, 553 F. Supp. 3d 1297, 1304 (N.D. Ga. 2021) ("Plaintiff's allegations may support an inference that the '817 Patent is *a component of* Defendant's Accused Device. But that is irrelevant for purposes of contributory

infringement under 35 U.S.C. § 271(c)" (emphasis in original)). A plaintiff must show that the ***accused device*** is covered by the patent. *Id.*

Like in *Merrill*, GTRC alleges no more than that Murata sells a component of an accused device, but it does not plead any facts sufficient to show that the accused device is "a ***patented machine***." 35 U.S.C. § 271(c) (emphasis added). For example, GTRC generally pleads:

> Accordingly, on information and belief, Murata also contributorily infringes the '914 Patent by providing Murata's multi-band, multi-layer LCP substrate products that practice one or more claims of the '914 Patent to end-users who sell, use, or import such Accused Products in the United States.

Complaint, ¶ 153.

According to GTRC's Complaint, it is the component, not the accused device that is covered by the patent. Thus, even accepting these factual allegations and making all reasonable inferences in GTRC's favor, the Complaint only supports an inference that the '914 Patent covers a component of the accused device. *Merrill Mfg.*, 553 F. Supp. 3d at 1304. But such is "is irrelevant for purposes of contributory infringement under 35 U.S.C. § 271(c)." *Id.* And since GTRC's Complaint does not contain any allegations that the accused device itself infringes the '914 Patent, GTRC has failed to state a claim for contributory infringement.

## V.    CONCLUSION

Even accepting the factual allegations in the Complaint as true and making all reasonable assumptions in GTRC's favor, GTRC fails to state a complaint for infringement of all of the asserted claims of the '914 Patent because the claims are directed to ineligible subject matter and thus cannot be infringed. Under Step One of *Alice*, the focus of the claims is on the results stemming from laws of nature and natural correlations without any specifically claimed means for obtaining those results. Under Step Two of *Alice*, there is nothing in the claims that amounts to "significantly more" than the claimed result stemming from the laws of nature and natural correlations. Accordingly, the claims are not eligible for patent protection.

Independent of the fact that GTRC's claims are not eligible for patent protection, GTRC's Complaint fails to state a claim for relief with respect to its contributory infringement claims. Accordingly, Murata respectfully requests that the Court dismiss the Complaint under Rule 12(b)(6).

DATED:  April 2, 2025                    By: */s/ Alan White*
_____

Richard Miller
Georgia Bar No. 065257
Alan White
Georgia Bar No. 410546
BALLARD SPAHR LLP
999 Peachtree Street NE, Suite 1600
Atlanta, Georgia 30062
Telephone: 678-420-9340
Email: millerrw@ballardspahr.com
         whiteda@ballardspahr.com

Jason T. Lao
Cal. Bar. No. 288161
jason.lao@haynesboone.com
HAYNES AND BOONE, LLP
600 Anton Blvd., Suite 700
Costa Mesa, CA 92626
(949) 202-3000
*To Appear Pro Hac Vice*

Dylan Freeman
TX Bar No. 24131314
dylan.freeman@haynesboone.com
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75201
(214) 651-5000
*To Appear Pro Hac Vice*

*Attorneys for Defendants Murata
Electronics North America, Inc. and
Murata Manufacturing Co., Ltd.*

## <u>CERTIFICATE OF COMPLIANCE WITH LR 5.1</u>

Pursuant to LR 7.1(D), I HEREBY CERTIFY that this brief has been prepared with one of the font and point selections approved by the Court in LR 5.1.


Date:  April 2, 2025                          */s/ Alan White*
                                              Alan White

27