## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GEORGIA TECH RESEARCH
CORPORATION,

                Plaintiff,

v.

MURATA ELECTRONICS NORTH
AMERICA, INC., and

MURATA MANUFACTURING CO.,
LTD.,

                Defendants.

Civil Action No. 1:24-cv-05268-JPB

## GEORGIA TECH RESEARCH CORPORATION'S RESPONSE
## IN OPPOSITION TO MOTION TO DISMISS [DOC. 13]

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................II

I.     INTRODUCTION ...............................................................1

II.    THE '914 PATENT INVENTION.......................................4

III.   ARGUMENT.......................................................................6

   A. The '914 patent claims an eligible invention. ................6

      1.  Alice step one: The '914 patent is directed to a novel multi-band RF
          device, not laws of nature or natural phenomenon. .................7

         i.   Murata rewrites the patent.................................7

         ii.  Murata cherry-picks caselaw............................10

      2.  Alice step two: The '914 patent was unconventional and novel.............14

      3.  Murata's eligibility challenge is inappropriate for a motion to dismiss..18

   B. GTRC properly pled a claim for contributory infringement. ........19

IV.    CONCLUSION.................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
 882 F.3d 1121 (Fed. Cir. 2018)............................................................................23

*AlexSam, Inc. v. Aetna, Inc.*,
 119 F.4th 27 (Fed. Cir. 2024)...............................................................................19

*Alice Corp. Pty. v. CLS Bank Int'l*,
 573 U.S. 208 (2014)......................................................................................6, 14

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
 967 F.3d 1285 (Fed. Cir. 2020).................................................................. passim

*AML IP, LLC v. Am. Eagle Outfitters, Inc.*,
 No. 6:21-CV-00823-ADA, 2022 WL 11456095 (W.D. Tex. Oct. 19, 2022) .....19

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
 569 U.S. 576 (2013)............................................................................................10

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
 827 F.3d 1341 (Fed. Cir. 2016)...........................................................................16

*Berkheimer v. HP Inc.*,
 881 F.3d 1360 (Fed. Cir. 2018)...........................................................................15

*Celgene Corp. v. Lotus Pharm. Co.*,
 No. CV 17-6842-SDW-LDW, 2018 WL 6584888 (D.N.J. Dec. 14, 2018) ........19

*Cellspin Software, Inc. v. Fitbit, Inc.*,
 927 F.3d 1306 (Fed. Cir. 2019)...........................................................................15

*ChargePoint, Inc. v. SemaConnect*, Inc.,
 920 F.3d 759 (Fed. Cir. 2019).............................................................................11

*Coop. Ent., Inc. v. Kollective Tech., Inc.*,
 50 F.4th 127 (Fed. Cir. 2022)................................................................. 4, 16, 18

*DDR Holdings, LLC v. Hotels.com, L.P.*,
 773 F.3d 1245 (Fed. Cir. 2014)...........................................................................16

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ................................................................................9

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)........................................... 6, 8, 9, 14

*INO Therapeutics LLC v. Praxair Distrib. Inc.*,
    782 F. App'x 1001 (Fed. Cir. 2019) ....................................................13

*King Pharms., Inc. v. Eon Labs, Inc.*,
    616 F.3d 1267 (Fed. Cir. 2010)........................................................2, 9

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
    566 U.S. 66 (2012) ..............................................................................14

*Merrill Mfg. Co. v. Simmons Mfg. Co.*,
    553 F. Supp. 3d 1297 (N.D. Ga. 2021) ..............................................22

*R2 Sols. LLC v. Am. Airlines, Inc.*,
    No. 4:22-CV-00353, 2022 WL 17477543 (E.D. Tex. Dec. 6, 2022) ..................19

*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278 (Fed. Cir. 2020)............................................................7

*Vanda Pharms. Inc. v. West-Ward Pharms.*,
    887 F.3d 1117 (Fed. Cir. 2018)..........................................................10

*Yu v. Apple, Inc.*,
    1 F.4th 1040 (Fed. Cir. 2021)............................................................13

**Statutes**

35 U.S.C. § 101 ....................................................................................1, 2

35 USC § 271(c) .......................................................................................27

**Rules**

Fed. R. Civ. P. 12(b) .................................................................................5

Fed. R. Civ. P. 15(a)(2)............................................................................30

**Other Authorities**

MPEP § 2106.04(b)(I).................................................................................................13

## I.    INTRODUCTION

The plain language of the '914 patent and the allegations of the Complaint control at the Rule 12 stage. Reviewing those, both grounds of Murata's motion should be denied. First, the asserted claims on their face recite a specific structural improvement for a two-layer RF module with an "active device," "organic substrate," and "metal layers" that "form at least a portion of … passive network[s]." Such a structure is plainly eligible as a "new and useful [] machine, manufacture or composition of matter" under 35 U.S.C. § 101. Second, the Complaint properly alleges that Murata contributorily infringes by making components that are sold to third parties who then make RF modules or other products using the Murata components to infringe the asserted patent. Thus, the Court should deny Murata's motion.

In its motion to dismiss [Doc. 13] ("MTD"), Murata argues that U.S. Patent No. 7,489,914 (the "'914 patent")[1] is directed to unpatentable subject matter because it seeks to patent laws of nature and natural phenomena. But that characterization distorts the patent. As the patent's title—"Multi-Band RF Transceiver with Passive Reuse in Organic Substrates"—makes clear, the inventors do not purport to have discovered a law of nature or natural phenomena. Rather, they invented, and the patent claims, a novel and unique multi-band radio

---

[1] The '914 patent is attached as Exhibit 1 to the Complaint. [Doc. 1-9].

frequency (RF) device, one with previously unknown design elements and performance characteristics. As such, the claims recite precisely the kind of subject matter intended for patenting.

The '914 patent represents a significant step forward in multi-band RF design. Before the '914 patent, RF device designers struggled to meet the ballooning demands placed on RF devices to integrate multiple data bands (e.g., cellular, WLAN, Bluetooth, etc.) into a single compact device. Conventional hardware either included too many discrete components or couldn't deliver adequate performance at high frequencies. Through extensive investigation, the '914 patent inventors realized that, by using specific materials to embed the most common circuit elements—passives—and combining the embedded passives with an active, they could create a new multi-band RF device that had better performance in a smaller package and at less cost. This improved design is far afield from patents that courts have found ineligible under 35 U.S.C. § 101, *i.e.,* those on methods claiming a result or biological processes.

Murata attempts to invalidate this plainly eligible invention under section 101 by mischaracterizing the facts and the law. First, Murata mischaracterizes the patent by ignoring whole swaths of the claims and distorting others. A proper § 101 analysis focuses on "the claim[s] as a whole, not individual limitations" and certainly not a defendant's self-serving rewriting. *King Pharms., Inc. v. Eon Labs,*

*Inc.*, 616 F.3d 1267, 1277 (Fed. Cir. 2010). Murata disassembles the claimed multi-band RF device into an "assortment of generic components" (MTD at 8) to recast the invention as an attempt to patent laws of nature and natural phenomena themselves. But this deconstruction ignores the actual arrangement of structures—like the metal layers that form a portion of the passive networks, a feature Murata does not even mention until page 22 of its brief—that, when considered as a whole, the patent examiner found were novel and non-obvious over the prior art. Murata cannot override that determination by rewriting the claims.

Second, Murata mischaracterizes the law by selectively citing cases from a different area of law and disregarding inconvenient legal doctrine within the very cases it relies on. Read accurately, Murata's own authority makes clear that a claim is only invalid where "on its face [the claim] clearly invokes a natural law, **and nothing more**, to achieve a claimed result." *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1290–94 (Fed. Cir. 2020) (emphasis added). Murata cannot show that is the case here.

Murata also argues that the patent can be found ineligible on a motion to dismiss because it includes purportedly "common components that can be found in any RF device." MTD at 15. Again, that's an oversimplification and mischaracterization of the claimed invention. And in any case, Murata ignores that the Federal Circuit has held that "[d]etermining whether the claimed [invention] is

well-understood, routine, or conventional is a question of fact that cannot be resolved at the Rule 12(b)(6) stage." *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 133 (Fed. Cir. 2022). Thus, Murata's motion should be denied.

Last, Murata contends that Complaint fails to state a claim for contributory patent infringement.[2] But the components identified in the Complaint are manifestly made to be sold to and used in other devices. Murata's accused products have no non-infringing use beyond enabling others to infringe.

## II.    THE '914 PATENT INVENTION

At the heart of today's ubiquitous wireless devices lie specialized hardware like radio frequency (RF) transceivers that enable wireless communication between devices. The '914 patent relates to that hardware. At a basic level, RF transceivers function by sending and receiving radio waves over a range of frequencies (a frequency band). At the time of the '914 patent, there was a push, driven by demand for higher data rates and greater connectivity, to develop RF transceivers that could operate on multiple frequency bands. '914 patent at 1:29–47. But fitting the components necessary for multi-band functionality into a small form factor led

---

[2] Murata asks the Court to "dismiss the Complaint" for this reason. MTD at 1; *id.* at 23 ("[T]he Court should still dismiss GTRC's Complaint in part …."), 25. But Murata's argument is really directed to GTRC's "claim for relief" for Murata's indirect, contributory infringement (within Count II). Fed. R. Civ. P. 12(b). Murata's (incorrect) arguments about contributory infringement have no relevance to Count I.

to significant design challenges such as problems with routing, interference, and power consumption. *Id.* at 1:48–2:4.

The '914 patent describes the inventors' unique solution to these problems. Key among their innovations was the determination that a compact, high performance multi-band RF device could be created by using "an organic-based substrate having at least two metal layers" and patterning the two metal layers "to form at least a portion of [a] first passive network and [a] second passive network." *Id.* at 2:1–32. For instance, figure 38F of the patent illustrates an organic-based substrate having metal layers that form embedded passives such as inductors and parallel plate capacitors. *Id.* at 25:6–8, 53–59, FIG. 38F.



FIG. 38F

The patent's detailed specification similarly describes various RF transceiver topologies having embedded passives that reduce the number of components

required and provide a high level of performance that, at the time of the '914 patent, was only possible with bulkier and costlier ceramics. *Id.* at 2:8–13, 13:37–48. This unique and previously unknown multi-band RF device was properly found by the patent examiner to be novel and patentable, resulting in issuance of the '914 patent.

## III.    ARGUMENT

### A.    The '914 patent claims an eligible invention.

Simply put, nothing in Murata's Motion to Dismiss comes close to overcoming the strong presumption that the '914 patent is valid—*i.e.*, directed to patentable subject matter.

To distinguish between patentable and unpatentable subject matter, courts apply a two-part test. First, courts must "determine whether the claims at issue are *directed to* a patent-ineligible concept." *Alice Corp. Pty. v. CLS Bank Int'l,* 573 U.S. 208, 218 (2014) (emphasis added). "If this threshold determination is met," courts "move to the second step of the inquiry and 'consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

A plain reading of the claims of the '914 patent makes clear that the patent is directed to a concrete, tangible device—namely "a multi-band RF device" comprising, among other things, "an active device" and "an organic-based substrate having at least two metal layers" that are patterned to form "at least a portion of [a] first passive network and [a] second passive network." '914 patent at claim 1. These features are significantly different from the "patent-ineligible concepts" found invalid by courts.

      1. *Alice step one: The '914 patent is directed to a novel multi-band RF device, not laws of nature or natural phenomenon.*

        i. <u>*Murata rewrites the patent.*</u>

Murata argues that the '914 patent is directed to "laws of nature" and "natural phenomena" under *Alice* step one because the patent's claims are directed to "the non-specific application of basic circuitry principles and laws of nature." MTD at 8. But this characterization ignores the actual claim language and distills the invention down to pure physics. Courts "must focus on the language of the [a]sserted [c]laims themselves." *TecSec, Inc. v. Adobe Inc.,* 978 F.3d 1278, 1292 (Fed. Cir. 2020). Here, the "focus" of the claims is a unique and previously unknown multi-band RF device. *See* '914 patent at 2:8–20. The claims recite "a multi-band RF device" comprising an arrangement of concrete and tangible elements with specific features like "at least two metal layers … patterned to form at least a portion of [a] first passive network and [a] second passive network." '914

patent at claim 1.[3] But Murata pretends that the patent only claims "generic components" by ignoring features like these that inconveniently undermine its position. MTD at 8–9. This straw man "untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *See Enfish*, 822 F.3d at 1337.

Take claim 1: its actual language provides for "an organic-based substrate having at least two metal layers, wherein the two metal layers are patterned to form at least a portion of the first passive network and the second passive network." '914 patent at claim 1. Murata does not even mention this element until page 22 of its brief. MTD at 22. Instead, Murata abstracts this to "a substrate" (*id.* at 8) and concludes "[claim 1] preempts ***any and all*** multi-band devices … using ***all*** organic-based substrates." *Id*. at 19. But not all organic-based substrates have "at least two metal layers" and not all metal layers are "patterned to form at least a portion of [a] first passive network and [a] second passive network." Only by selectively editing the claims do Murata's conclusions make sense.

Similarly, Murata reads made-up aspects of the invention into the claims. *Id.* at 9–10. For instance, nowhere do the claims recite "optimizing multi-band RF performance," yet Murata pretends the claims are a simple recitation of this goal.

---

[3] While this brief focuses on claim 1, GTRC contends that claims 2 and 11–16 are patentable for at least the same reasons as claim 1.

*Id.* at 10. It is true that the multi-band RF device of the claims "may satisfy one or more of [the] issues of power consumption, compatibility, interference, and integration," ('914 patent at 2:2–4) but the patent's claims recite concrete, tangible elements. And it is the language of those claims that count. *Am. Axle*, 967 F.3d at 1293 ("The Supreme Court's cases focus on the claims, not the specification, to determine section 101 eligibility.").

Murata's mischaracterizations undercut its argument. To determine ineligibility, the court must examine "the claim[s] as a whole, not individual limitations." *King Pharms.* 616 F.3d at 1277. Any invention could be characterized as "an assortment of generic components" (MTD at 8) if claim elements are simply deleted and other made-up aspects of the invention are read into the claims. "[O]vergeneralizing claims, 'if carried to its extreme, make[s] all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious.'" *Enfish*, 822 F.3d at 1337 (quoting *Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981)). Absent these distortions, a plain reading of the claims makes clear that they are directed to a concrete and tangible "multi-band RF device" that falls comfortably within patent-eligible subject matter under *Alice* step one.

ii. *Murata cherry-picks caselaw.*

Murata's error is also apparent in their interpretation of the caselaw. From the outset, Murata selectively chooses cases about *abstract ideas* to give the impression that claims comprising tangible components—as is the case here—are treated the same as method claims invalidated under the *laws of nature and natural phenomenon* exception. They are not. Indeed, *none* of the examples identified by the U.S. Patent and Trademark Office as impermissible claims to laws of nature and natural phenomenon are for *devices* like the multi-band RF device at issue here. MPEP § 2106.04(b)(I) (citing, among others, *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013); *Vanda Pharms. Inc. v. West-Ward Pharms.*, 887 F.3d 1117 (Fed. Cir. 2018)). Murata's authority does not suggest otherwise. *See Am. Axle*, 967 F.3d at 1290 (claiming a method). In fact, *American Axle* highlights that claims to physical structures—as is the case here—are *not* treated the same as method claims. *Am. Axle*, 967 F.3d at 1295 ("This case would be significantly different, if, for example, specific FEA models were included in claim 22. But they are not. What is missing is any physical structure or steps for achieving the claimed result.").

Relying on *American Axle*, Murata also argues that a patent's claims must include "a specific means or method that improves the relevant technology." MTD at 7. But this is a selective reading of *American Axle*. What the Court in *American*

*Axle* said was: "[c]laiming *a result* that involves application of a natural law *without limiting the claim to particular methods of achieving the result* runs headlong into the very problem repeatedly identified by the Supreme Court in its cases shaping eligibility." 967 F.3d at 1295 (emphasis added). In fact, the *American Axle* Court explicitly cabined its holding to situations in which "a claim on its face clearly invokes a natural law, *and nothing more*, to achieve a claimed result." *Id.* at 1298 (emphasis added). But Murata fails to show that the '914 patent *claims a result*, let alone a result *that involves application of a natural law and nothing more*.

Take Murata's analysis of claim 1: Murata does not even allege that the **claims** claim a result. Instead, Murata refers to the **specification** *to read into the claims* the goal of "optimizing multi-band RF performance." MTD at 9–10 (citing *ChargePoint, Inc. v. SemaConnect*, Inc., 920 F.3d 759 (Fed. Cir. 2019), for the proposition that the "directed to inquiry may involve looking to the specification to understand the problem facing the inventor" (internal quotation marks omitted)). But the Court in *ChargePoint* also explained that even if the specification can be "helpful" to understand the problem, "any reliance on the specification in the § 101 analysis must always *yield to the claim language*. ... [T]he specification cannot be used to import details from the specification if those details are not claimed." 920 F.3d at 769. Further, as Murata acknowledges, "features that are not claimed are

irrelevant" to the *Alice* analysis. MTD at 18; *Am. Axle*, 967 F.3d at 1293 (citing cases directing courts to "focus on the claims, not the specification, to determine section 101 eligibility"). Murata does not, and cannot, point to any language *in the claims* that directly focuses on the "goal," "result," or "correlation" that Murata argues is what the claims are directed to. Instead, to find the natural phenomena, Murata relies entirely on the specification. Murata's motion therefore fails at the outset.

What is more, Murata appears to overlook the focus on identifying a *claimed* result in the very cases it relies on. Specifically, the courts in *American Axle*, *INO*, and *Yu*, began their analysis by noting that the ***claims* claimed a result**. For example, in *American Axle*, the claim at issue recited a method of manufacturing a driveshaft to meet specific performance standards, including a step of "tuning a mass and a stiffness of at least one liner." 967 F.3d at 1290. The Federal Circuit concluded it was "evident on its face" that the claim "merely describes a desired result." *Id.* at 1290–94 ("The claim on its face does not identify the 'particular [tuned] liners' or the 'improved method' of tuning the liners to achieve the claimed result.").

Similarly in *INO*, the Court described the claim, which recited withholding a treatment to reduce the risk of pulmonary edema, as "a claim not to treat—i.e., not to disturb these naturally-occurring physiological processes within the LVD

patient's body …." *INO Therapeutics LLC v. Praxair Distrib. Inc.*, 782 F. App'x 1001, 1006 (Fed. Cir. 2019). The Federal Circuit concluded that the "focus of the invention is screening for a particular adverse condition that, once identified, requires iNO treatment be withheld." *Id.* at 1007; *see also id.* at 1008–09 ("The claimed invention is focused on screening for a natural law. … It simply sets out an observation of the adverse event, and then instructs the physician to withhold iNO treatment."). This improper focus is what the Court explained would "risk[] monopolizing the [body's] natural processes" and "collapses into a claim focused on the natural phenomenon," as Murata notes. *Id.* at 1006, *cited in* MTD at 6.

Finally, in *Yu v. Apple, Inc.*, the representative claim recited an "improved digital camera" comprising (among other things) an image processor "producing a resultant digital image from [a] first digital image enhanced with [a] second digital image." 1 F.4th 1040, 1042 (Fed. Cir. 2021). The Court concluded the claim was "directed to a result or effect," which was the "abstract idea of taking two pictures … and using one picture to enhance the other in some way." producing an enhanced digital image—"that itself is the abstract idea." *Id.* (internal quotation marks omitted); *see also id.* at 1044 ("[C]laim 1's solution … is the abstract idea itself—to take one image and 'enhance' it with another.").

The common thread among these cases is that the claims themselves recited the result or effect that the claims were "directed to" under *Alice* step one.

Tellingly, Murata omits mentioning this threshold requirement altogether. That is because there is no result or effect recited in the '914 patent claims.

In sum, the claims of the '914 patent are directed to a multi-band RF device, as recited in the claims. They are not "directed to" a law of nature. Murata's heap of potential law of nature or natural phenomenon—it cites *all of* "impedance matching, correlation between impedance and frequency, and the inherent, naturally occurring properties of organic-based substrates," MTD at 8— underscores that weakness of its argument. "At some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71 (2012)).

2.  *Alice step two: The '914 patent was unconventional and novel.*

Because Murata has not established that the '914 patent is directed to patent-ineligible subject matter, the court need not proceed to step two of the *Alice* analysis. *See Enfish*, 822 F.3d at 1334. But were it to do so, the step would be satisfied.

Under step two, the Court should "consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (internal quotation marks omitted). An invention is patentable when the claim

limitations "involve more than performance of well-understood, routine, and conventional activities previously known to the industry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018). And at the Rule 12(b)(6) stage, that test is satisfied with "plausible and specific factual allegations that aspects of the claims are inventive." *Cellspin Software, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019) (holding district court "erred by ignoring the principle … that factual disputes about whether an aspect of the claims is inventive may preclude dismissal at the pleadings stage under § 101").

The elements of the claims of the '914 patent—both in isolation and in combination—were far from conventional. The convention at the time was to use inorganic substrates like Low Temperature Co-Fired Ceramics for multi-band RF devices. Complaint ¶ 35. The inventors took a different approach however, by using "an organic-based substrate having at least two metal layers, wherein the two metal layers are patterned to form at least a portion of the first passive network and the second passive network." '914 patent at claim 1. Doing so enabled high performance passives that otherwise require "bulkier and costlier ceramic cavity and monoblock filters." '914 patent at 13:46–48. And combining these high-performance passives with an active device enabled "low-profile ultra thin modules," which are "desirable" and "particularly … advantageous for [RF] devices." *Id.* at 24:39–45; Complaint ¶ 36.

Murata's step two arguments fail to confront this innovation sincerely. Instead, Murata boils claim 1 down to merely "use of an organic substrate." MTD at 16. But again, that is not what the claim recites. And in any case, Murata's exhibits do nothing to establish that the claims were conventional. Take the Japanese patent to "Endo," which Murata says "discloses 'using a standard organic multilayered substrate' for use in a 'compact band pass filter.'" *Id.* (citing Exhibit A [Doc. 13-1]). Even if the reference is relevant (which GTRC does not concede), the existence of a "compact band pass filter" does not render conventional "an organic-based substrate having at least two metal layers," let alone a multi-band RF device comprising such an organic-based substrate. *Coop. Ent.*, 50 F.4th at 133; *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 n.5 (Fed. Cir. 2014) ("[O]n a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions."); *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) ("The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art … an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").[4]

---

[4] Murata's other exhibits have similar deficiencies and are therefore not discussed.

If anything, the Examiner's Non-final Rejection (in the related patent application to the '914 patent) shown in Murata's Exhibit A establishes that the claims were *unconventional*. In the Non-final Rejection, the examiner explicitly stated that the pending claim 11 was allowable—i.e., *novel and nonobvious*—over the prior art. *See* Murata Exhibit A [Doc. 13-1] at 9 (identifying "Allowable Subject Matter" in claim 11). As shown in GTRC's Exhibit 1, another excerpt of the file history that Murata omitted, the pending claim 11 recited, "wherein the organic dielectric layer comprises a first patterned metal layer and a second patterned metal layer formed on opposite surfaces thereof, and further comprises at least one via electrically connecting the first patterned metal layer and the second patterned meta layer." GTRC Exhibit 1 at 2 (showing then pending claims, as filed Mar. 28, 2003). Thus, while that claim is different in scope than the '914 patent's claims, the examiner's allowance of certain claims at minimum indicates that an organic substrate with at least two metal layers as claimed in the '914 patent were *not* well-understood, routine, and conventional.

Murata's own statements cited in the Complaint further confirm the innovativeness of the claims. For example, claim 11 of the '914 patent recites that the "organic-based substrate [having at least two metal layers] comprises liquid crystalline polymer [(LCP)]." '914 patent at claim 11. Murata repeatedly praises the benefits of multi-layer LCP technology and the innovativeness of products

17

using multi-layer LCP. *See, e.g.,* Complaint ¶¶ 53, 92, 96, 97, 104, 105. Or take claim 16, which recites "wherein at least one of the metal layers is patterned to form at least a portion of a component included in the second passive network." '914 patent at claim 16. Murata documents also tout the benefits of integrating passive devices into a substrate. *See, e.g.,* Complaint ¶¶ 98, 104, 105. Thus, Murata's own statements, cited in the Complaint, confirm that the claims are far from "an assortment of generic components" (MTD at 8) and are indeed unconventional. As such, *Alice* step two confirms that the '914 patent claims eligible subject matter.

   3. *Murata's eligibility challenge is inappropriate for a motion to dismiss.*

Finally, Murata's argument that claim 1 "preempts ***any and all*** multi-band devices, including ***all*** circuit configurations of ***any*** active device and passive components, using ***all*** organic-based substrates," MTD at 19 (all emphasis in original), relies on a series of facts—like the disputed assertion that claim 1 merely includes "common components that can be found in any RF device," *id.* at 15—that Murata has not established and is not entitled to assume. *Coop. Ent.,* 50 F.4th at 133 (holding that "district court should have denied the motion" because the complaint and "patent's written description create a plausible factual issue regarding the inventiveness" of the claims that "cannot be resolved" at the Rule 12(b)(6) stage"). Likewise, because Murata raises issues of claim construction, *see,*

*e.g.*, MTD at 9 ("This is not a phrase that limits claim 1 in any significant way."),

Murata's motion, like those raised in other courts, should be denied. *See, e.g., R2*

*Sols. LLC v. Am. Airlines, Inc.*, No. 4:22-CV-00353, 2022 WL 17477543, at *2

(E.D. Tex. Dec. 6, 2022) (denying motion to dismiss without prejudice and

deferring the issue of patent eligibility under § 101 until after claim construction);

*Celgene Corp. v. Lotus Pharm. Co.*, No. CV 17-6842-SDW-LDW, 2018 WL

6584888, at *2 (D.N.J. Dec. 14, 2018) (same); *AML IP, LLC v. Am. Eagle*

*Outfitters, Inc.*, No. 6:21-CV-00823-ADA, 2022 WL 11456095, at *7–8 (W.D.

Tex. Oct. 19, 2022) (same).

### B.    GTRC properly pled a claim for contributory infringement.

To state a claim for contributory infringement, a complaint must allege: "(1)

the defendant had 'knowledge of the patent in suit,' (2) the defendant had

'knowledge of patent infringement,' and (3) the accused product is not a staple

article or commodity of commerce suitable for a substantial non-infringing use."

*AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 47 (Fed. Cir. 2024). And the component

sold must be a "material part of the invention." *Id.* (quoting 35 USC § 271(c)).

Murata does not dispute that any of the three elements of contributory infringement

are sufficiently alleged. Rather, the only question raised in Murata's Motion to

Dismiss is whether the Complaint properly alleges that Murata sold a "component

of a patented machine" in addition, or in the alternative, to alleging Murata's direct infringement. MTD at 23.

The Complaint meets this standard. It alleges that "Murata knew … that the use … of the Accused Devices … by its customers would give rise to infringement of at least one claim of the '914 Patent." Complaint ¶ 146; *see also id.* ¶ 153. This allegation is supported by evidence that Murata sells the claimed configurations of organic substrates and metal layers (without the claimed "active device") as Murata's MetroCirc™ product. *Id.* ¶¶ 96–98, 141, 153. The MetroCirc™ products are intended for manufacture into RF modules that infringe by adding the claimed "active device." *Id.* ¶ 96. For example, the Complaint quotes Murata's MetroCirc™ product description, showing that Murata made organic substrates ("LCP") with metal layers ("copper foil sheets") with the intention that they be incorporated into RF modules ("RF … antennas"):

> 96.    Murata described MetroCirc™ as "a multilayer resin substrate comprising resin sheets using LCP film and copper foil sheets stacked in many layers employing Murata's multilayer technology" that "can be used for RF and digital signal transmission wires, antennas, and much more, enabling the development of components of any shape with exceptional RF characteristics."

*Id.* ¶ 96. Thus, the Complaint properly alleges that Murata's contributory infringes through sales of MetroCirc™ that are used to manufacture infringing RF modules.

Also, the Complaint alleges that the Accused Products are made for, and incorporated as components into, "routers, personal computers, smartphones, IoT devices, automobiles, and other products, including without limitation radio frequency devices and modules." *Id.* ¶ 14. The Complaint also identifies certain "antenna-in-package (AiP) modules" and "RF Modules" that are used in identified smartphones. *See id.* ¶¶ 116–123 (identifying and depicting modules that are components of third-party devices); Appendix A–C to Complaint [Docs. 1–1 to 1–3]. In sum, the Complaint alleges that Murata provides Accused Products to third parties with knowledge that the Accused Products would be used to manufacture infringing products. Complaint ¶¶ 152–153; *see also id.* ¶¶ 145, 147. Thus, GTRC has stated a claim for contributory infringement.

Against the well-pled allegations of contributory infringement, Murata makes a terse argument (based on a single district court case) that GTRC did not plead "facts sufficient to show that the accused device is 'a patented machine.'" MTD at 23–24. Murata argues that the Complaint "does not contain any allegations that the accused device … infringes the '914 patent," and that the "Complaint only supports an inference that the [patent] covers *a component of the accused device*." *Id.* at 24.

Murata's arguments fail for two reasons. *First*, as shown above, the Complaint alleges that the accused devices include components that are sold to

third parties who then make RF modules or other products using the Murata components to infringe the asserted patent. *E.g.*, Complaint ¶¶ 14, 102–103. Thus, the complaint pleads contributory infringement as a matter of law.

*Second*, Murata's citations to *Merrill Manufacturing* are inapplicable here. In that case, the plaintiff asserted infringement of a *design* patent, D881,817, claiming an "ornamental design for a wire connector."[5] The "Accused Device" there was a device known as a "terminal block" that included copper mechanical wire connectors. *Merrill Mfg. Co. v. Simmons Mfg. Co.*, 553 F. Supp. 3d 1297, 1300–01 (N.D. Ga. 2021). It was the *ornamental design* of that wire connector that the plaintiff alleged was incorporated into the defendant's accused device. *Id.*

The *Merrill Manufacturing* Court then concluded that the claimed ornamental design was "a component of Defendant's Accused Device," but not necessarily that the defendant sold a device that contributed to infringement by others. *Id.* at 1304. Here, in contrast, GTRC alleges both that Murata's Accused Products directly infringe and that Murata contributes to others' infringement by selling components of third-party products that directly infringe by virtue of including the Murata components. Complaint ¶¶ 141–153. Thus, GTRC states a claim for contributory infringement.

---

[5] See Amended Complaint ¶ 1 and Exhibit A, *Merrill Mfg. Co. v. Simmons Mfg. Co.*, 1:20-cv-03941-MLB (N.D. Ga. Oct. 20, 2020), ECF No. 31 and 31-1.

## IV.    CONCLUSION

Murata's motion should be denied. But if the Court has any remaining concerns about the eligibility of the claims or sufficiency of the contributory infringement pleading, then GTRC requests the Court grant leave to amend the Complaint to cure the supposed insufficiencies. Fed. R. Civ. P. 15(a)(2); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126 (Fed. Cir. 2018).

*/s/ Warren J. Thomas*

John W. Harbin (Ga. Bar No. 324130)
Gregory J. Carlin (Ga. Bar No. 455865)
Warren J. Thomas (Ga. Bar No. 164714)
**Meunier Carlin & Curfman LLC**
999 Peachtree Street NE
Suite 1300
Atlanta, GA 30309
Tel: 404-645-7700
jharbin@mcciplaw.com
gcarlin@mcciplaw.com
wthomas@mcciplaw.com

*Attorneys for Plaintiff Georgia Tech Research Corporation*

## LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), I certify that this brief has been prepared with one of the font and point selections approved by the Court in LR 5.1.

*/s/ Warren J. Thomas*
Warren J. Thomas