### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| IN RE PATENT OF GOVIND ET AL. § | REQUEST FOR *EX PARTE* |
| § | REEXAMINATION |
| U.S. Patent No. 7,489,914 § | |
| § | Attorney Docket No.: |
| Filed: April 25, 2005 § | 0049195.00030US03 |
| § | |
| Issued: February 10, 2009 § | Customer No.: 27683 |
| § | |
| Title: MULTI-BAND RF TRANSCEIVER § | |
| WITH PASSIVE REUSE IN § | |
| ORGANIC SUBSTRATES § | |

### <u>REQUEST FOR EX PARTE REEXAMINATION</u>

Mail Stop *Ex Parte* Reexam
Hon. Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Pursuant to the provisions of 35 U.S.C. §§ 302-307, Murata Manufacturing Co., Ltd, and Murata Electronics North America, Inc (together "Requester"), and real parties-in-interest, hereby requests an *ex parte* reexamination of claims 1-2 and 4-20 ("Challenged Claims") of United States Patent No. 7,489,914 ("the '914 patent," EX1001) that issued on February 10, 2009, to Govind et al., resulting from a patent application filed on April 25, 2005.

Requester hereby asserts that the prior art references presented herein present a substantial new question of patentability with respect to claims 1-2 and 4-20 of the '914 patent. The analysis and combination of prior art references of this Request are new and non-cumulative to the prior art that was before the Examiner during the original prosecution of the '914 patent.[1] The '914 patent describes "RF transceivers and their components by using discrete active devices in

---

[1] As discussed below, IPR2025-00383 was discretionarily denied before reaching a merits panel and without any consideration of the prior art.

conjunction with passive components…embedded [] in organic substrates. EX1001, Abstract. Further, "the embedded passives may have multi-band characteristics, thereby allowing multi-band [devices] to be implemented with fewer components." *Id*.

As shown below, such concepts were well known. The prior art Francisco (EX1005), for example, describes a "multi-band amplifier in a communications system to scale the signal level of a signal communicated over one of multiple frequency bands… the multi-band amplifier uses an input [passive] network to achieve a selected input impedance, and an output [passive] network to achieve a selected output impedance." EX1005, 1:50-56.  While Francisco does not detail the implementation of the components and substrate of its amplifier, JP466 describes forming an amplifier including "a matching circuit…[and] part of an FET bias circuit (resistor, capacitor)…and the like [passives], are arranged on each layer of the dielectric [organic-based] substrate." EX1006, [0006], FIG. 5.  As the analysis below demonstrates, Francisco and JP466 as well as other references presented in this Request, render obvious the Challenged Claims.[2] Thus, Requester requests that an Order for reexamination and an Office Action rejecting claims 1-2 and 4-20 be issued.

The '914 patent is currently the subject of litigation, namely *Georgia Tech Research Corporation* v. *Murata Electronics North America, Inc. et al,* NDGA-1-24-cv-05268 (NDGA, Nov. 17, 2024). No final judgment has been entered into the case.

---

[2] Requester discusses in Section III.D that any secondary considerations do not and would not disturb the strong obviousness findings shown in Sections III.A, III.B. and III.C.

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,489,914

## TABLE OF CONTENTS

I.    CERTIFICATION REGARDING NO ESTOPPEL ..........................................5

II.   STATEMENT POINTING OUT SUBSTANTIAL NEW QUESTIONS OF
      PATENTABILITY ..............................................................................................5
      A.    Summary ........................................................................................................5
      B.    Overview of the '914 patent .........................................................................5
      C.    Prosecution History and Reasons for Allowance of the '914 patent ...........8
            1.    Original Prosecution .........................................................................8
            2.    Inter Partes Review of the '914 patent...........................................10
      D.    Claim Construction .....................................................................................11
      E.    Background Facts.........................................................................................11
      F.    Citation of Prior Art Patents and Printed Publications ..............................12
      G.    Identification of Substantial New Questions of Patentability.....................13
            1.    Francisco and JP466 presents a Substantial New Question of
                  patentability (SNQ). .......................................................................13
            2.    Summary of the Remaining Prior Art ..............................................15
            3.    Discretionary Denial under 35 U.S.C. § 325(d) is not warranted.....15

III.  DETAILED EXPLANATION OF THE PERTINENCE AND MANNER OF
      APPLYING THE PRIOR ART REFERENCES TO EVERY CLAIM FOR
      WHICH REEXAMINATION IS REQUESTED ............................................17
      A.    Proposed Rejection 1: Claims 1-2, 5, and 12-20 are obvious under 35
            U.S.C. § 103(a) over Francisco and JP466 ................................................18
            1.    Summary of Francisco (EX1005) .....................................................18
            2.    Summary of JP466 (EX1006) ..........................................................20
            3.    Reasons to combine Francisco and JP466 .......................................21
            4.    Claim 1 .............................................................................................25
            5.    Claim 2 .............................................................................................42
            6.    Claim 12 ...........................................................................................44
            7.    Claim 13 ...........................................................................................45
            8.    Claim 14 ...........................................................................................48
            9.    Claim 15 ...........................................................................................49
            10.   Claim 16 ...........................................................................................51
            11.   Claim 5 .............................................................................................52
            12.   Claim 17 ...........................................................................................57
            13.   Claim 18 ...........................................................................................58
            14.   Claim 19 ...........................................................................................58
            15.   Claim 20 ...........................................................................................58
      B.    Proposed Rejection 2: Claims 4 and 6 are obvious in view of Francisco,
            JP466 and Hirayama ...................................................................................59
            1.    Summary of Hirayama (EX1008) .....................................................59
            2.    Reasons to combine Francisco-JP466 and Hirayama ......................59
            3.    Claim 4 .............................................................................................62
            4.    Claim 6 .............................................................................................64

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,489,914

C.   Proposed Rejection 3: Claims 7-11 are obvious over Francisco, JP466 and
     Okubora..................................................................................................64
     1.   Summary of Okubora (EX1007)...............................................64
     2.   Reasons to combine Francisco-JP466 and Okubora.................65
     3.   Claim 11...................................................................................68
     4.   Claim 7.....................................................................................70
     5.   Claim 8.....................................................................................71
     6.   Claim 9.....................................................................................72
     7.   Claim 10...................................................................................72
D.   Secondary Considerations related to the obviousness of the Challenged
     Claims.....................................................................................................73

IV.   **LIST OF EXHIBITS** .........................................................................**77**

V.    **CONCLUSION** ..................................................................................**79**

VI.   **CERTIFICATE OF SERVICE** .........................................................**80**

I.    **CERTIFICATION REGARDING NO ESTOPPEL**

In accordance with 37 C.F.R. § 1.510(b)(6), the Requester hereby certifies that the estoppel provisions of 35 U.S.C. § 315(e)(1) and 35 U.S.C. § 325(e)(1) do not prohibit the requester from filing this *ex parte* reexamination request.

II.    **STATEMENT POINTING OUT SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY**

A.    **Summary**

This Request presents a substantial new question of patentability for claims 1-2 and 4-20 of the '914 patent. Prior to describing the substantial new questions of patentability presented in this request, provided below is an overview of the '914 patent, a discussion of claim construction, an identification of background facts, and a listing of the prior art being discussed in the present request.

B.    **Overview of the '914 patent**

The '914 patent relates to RF transceivers operable at multiple RF bands, i.e., multi-band transceivers. EX1001, 1:23-27. FIG. 15, below, illustrates a receiver portion using only a single path for multiple band frequencies, which is contrasted with different paths for each frequency band (*compare* FIG. 14). EX1001, 17:18-20, 16:53-61.

**EX1001, FIG. 15 (annotated)**

The '914 patent suggests multi-band RF transceiver topologies can reuse components at different frequencies and gives examples of a voltage controlled oscillator (VCO) and a low noise amplifier (LNA). EX1001, 2:8-20.

FIG. 35 illustrates an LNA with an active device (shown as a bipolar junction transistor) and matching networks at its input and output. EX1001, 24:10-27.[3] The matching networks are labeled as including embedded passives.

---

[3] The label of the network including L3, L4, C2 should read an "Output matching network using embedded passives." EX1003, ¶48.

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,489,914



**EX1001, FIG. 35
(annotated)**

The '914 patent describes embedded passives formed in an organic substrate to reduce the form factor of the module. EX1001, 24:38-46, 58-63. FIG. 38A is one illustration of a substrate that shows six metal layers, where metal layers are on each surface of a liquid crystal polymer (LCP) layer. The metal layer formed on the LCP layer may include passives (inductors capacitors), while the additional metal layers on additional layers may contain additional components or function as ground shields. EX1001, 25:4-12.



**EX1001, FIG. 38A**

"Rogers 4350B" and "Rogers 4450B" shown in FIG. 38A are materials from Rogers Corporation commonly used in the industry. EX1003, ¶50 (citing EX1025).

### C.    Prosecution History and Reasons for Allowance of the '914 patent

#### 1.    Original Prosecution

During the prosecution leading to the '914 patent, the Patent Office first issued a restriction requirement between claims to "multi-band low noise amplifier [LNA] [of] Fig. 35" and "multi-band oscillator [of] Fig. 16A and 27." EX1002, p. 94. Applicants elected the LNA embodiment. EX1002, p. 88. The proposed rejections similarly discuss the claims in terms of an LNA.

In a subsequent action, the original examiner allowed most claims but rejected then pending claims 1-3 as anticipated by U.S. Patent 6,075,995 to Jensen ("Jensen"). The original examiner alleged Jensen taught a multi-band device operable at multiple frequencies (GSM and DCS) that included an active device ("power amplifier module 1"), which was comprised of two separate power amplifiers 4, 6 within the module.

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,489,914



**Jensen, FIG 1**

In this context, the original examiner pointed to an alleged "first passive network" as that of power amplifier 4 adapted to 900 MHz (Fig. 3), and separately to an alleged "second passive network" as that of power amplifier 6 adapted to 1800 MHz (Fig. 4), both amplifiers 3, 4 being within module 1.



original examiner's
*first passive network* of LNA 3

*FIG.3*



original examiner's
*second passive network* of LNA 4

*FIG.4*

**Jensen, FIGS. 3-4**

In response to the rejection, Applicants cancelled non-elected claims and amended then-pending claim 1 to include dependent claim subject matter that was indicated to be allowable:

> 1.    (Currently Amended)  A multi-band RF device operable at a first frequency and a second frequency different from the first frequency, comprising:
>
>    an active device;
>
>    a first passive network in communication with the active device, the first passive network comprising a first matching network at an input of the active device;
>
>    a second passive network in communication with the active device, the second passive network comprising a second matching network at an output of the active device; and
>
>    an organic-based substrate having at least two metal layers, wherein the two metal layers are patterned to form at least a portion of the first passive network and the second passive network, wherein impedances of the first and second passive networks are different at the first frequency than the second frequency.

EX1002, pp. 56-61, 44-51. Applicants' amendments provided for the first / second passive networks to be at the "input" and "output," respectively, of "the active device." *Id*. A Notice of Allowance copying each element of the independent claims issued. EX1002, pp. 33-37.

However, positioning a first passive network and a second passive network at an input and output (respectively) of a (same) active device for multi-band operation was not new.

## 2.    Inter Partes Review of the '914 patent.

The '914 patent was recently challenged in IPR2025-00383 ("the IPR"), which was filed by Murata Manufacturing Co., Ltd., a real-party-in-interest for this Request. The IPR was subject to the new bifurcated procedure as defined in the Interim Processes for PTAB Workload Management memorandum of March 26, 2025. ***Without ever reaching a merits panel***, the Director denied the IPR for discretionary reasons. IPR2025-00383, Paper 14, p. 2 (noting the '914 patent "has been in force for more than 16 years, creating strong settled expectations for Patent

Owner"). Accordingly, the Office has ***not*** considered the merits of the analysis of the proposed rejections or prior art of this Request.

### D.    Claim Construction

Requester believes that no terms require formal construction.

### E.    Background Facts

The statements below may be useful to support the proposed rejections by demonstrating various background knowledge that would have been known to someone skilled in the art.  *See* MPEP 2144.03.

- **Background Fact #1:** Multi-band RF devices were well-known in the art. EX1005, Abstract, 1:10-45; EX1014-EX1016.

- **Background Fact #2:** Amplifiers are typically comprised of a core amplifying device, typically a transistor, to provide the gain, and passives (resistors, inductors, capacitors) arranged in a network to provide for biasing and impedance matching in conjunction with the core amplifying device. *See*, *e.g.*, EX1005; EX1007, [0006]; EX1008, [0004], [0038]-[0039]; EX1012, pp. 421-424; EX1014-EX1016; EX1021, pp. 225-226; EX1037, [0073].

- **Background Fact #3:** Re-using components (passives) at multiple frequencies in a multi-band RF device was known. EX1005, 1:42-46, 62-67; EX1008, [0005]-[0007], [0071]; EX1018, 1:10-29; EX1020, 3:42-53; EX1021, pp. 225-226;

- **Background Fact #4**: Embedding passives in substrates of various materials, including when implementing RF devices, was well-known in the art. EX1006; EX1012, pp. 424-426, 437-439, 452-456;  EX1024, FIGS. 9-12; EX1025, pp. 2, 6; EX1026, [0001]-[0005], [0157]-[0163], EX1027, Abstract; EX1028, FIG. 8; EX1029, FIG. 1, [0004], [0041]; EX1037, [0016], [0037], [0058].

- **Background Fact #5**: Use of organic-based substrates, including liquid crystalline polymer (LCP), was well-known in the art. EX1006; EX1012, p. 456; EX1023, p. 443; EX1024, [0012], [0018], [0048]-[0049]; EX1025, pp. 9-16;  EX1032, Abstract, p. 503; EX1033, Abstract, p. 249; EX1037, Abstract.

- **Background Fact #6**: Under basic principles of physics, passive networks, such as inductor-capacitor circuits, present different impedances in response to signals having different frequencies. EX1012, pp. 432; EX1014, 1:18-61 ("The impedances of the components and the matching circuits are frequency dependent.").

### F.    Citation of Prior Art Patents and Printed Publications

In accordance with 37 C.F.R. § 1.510(b)(3), reexamination of claims 1-2 and 4-20 (the

Challenged Claims) of the '914 patent is requested in view of the following references:

| | |
|---|---|
| EX1005 | U.S. Patent No. 6,128,508 ("Francisco") |
| EX1006 | JP 2001-267466 ("JP466") including original Japanese language document, English translation, and Translator's certification |
| EX1007 | European Patent Application EP 1 189 345 A2 ("Okubora") |
| EX1008 | U.S. Patent Application Publication No. 2002/0118067 ("Hirayama") |

- U.S. Patent 6,128,508 was filed Dec. 27, 1996 and issued Oct. 3, 2000 (EX1005, "**Francisco**"); Francisco qualifies as prior art under (pre-AIA) 35 U.S.C. §102(b).
- JP 2001-267466A was published September 28, 2001, (EX1006, "**JP466**"); JP466 qualifies as prior art under (pre-AIA) 35 U.S.C. §102(b).
- EP 1 189 345 A2 filed September 13, 2001, and published March 20, 2002 (EX1007, "**Okubora**"); Okubora qualifies as prior art under 35 U.S.C. §102(b).
- U.S. 2002/0118067 filed February 22, 2002 and published August 29, 2002 (EX1008, "**Hirayama**"); Hirayama qualifies as prior art at least under 35 U.S.C. §§102(a), 102(e).[4]

A detailed explanation of the pertinence and manner of applying the patents and printed

---

[4] The '914 patent lists an earliest possible priority date of March  28, 2003. This priority date is not disputed within this request for reexamination as all prior art pre-dates this earliest possible priority date.

publications to every claim for which reexamination is requested is set forth in Section III below.

### G.    Identification of Substantial New Questions of Patentability

In this request, a substantial new question (SNQ) of patentability is raised as set forth below.

#### 1.    Francisco and JP466 presents a Substantial New Question of patentability (SNQ).

Francisco and JP466 present an SNQ because neither reference has been considered by the Office and Francisco teaches the claim limitations that the Examiner found lacking in art of record during prosecution.

During prosecution, the previously cited art (Jensen) was distinguished by amending the claim to recite that the first and second passive networks were, respectively, at the input and output of "the active device." *See* Section II.C.1 distinguishing Jensen's alleged first passive network associated with a first LNA device and second passive network associated with a second LNA device. However, Francisco teaches these features—namely, a first passive network at the input of an active device, and a second passive network at the output of that same active device. And that active device is for dual-band operation.



**EX1005, FIG. 3
(annotated)**

Thus, Francisco thus teaches what the art of record did not. Its teachings are thus not cumulative. JP466 teaches forming such circuitry on an organic-based substrate.

Because Francisco in view of JP466 teaches the very arrangement found missing by the original examiner and because neither was previously considered,  Francisco in view of JP466 raises a substantial new question of patentability for claims 1-2 and 4-20 of the '914 patent. As discussed above, Francisco in view of JP466 was never considered by the Office as the Director denied a previously-filed IPR (IPR2025-00383) for discretionary reasons ***without ever reaching a presentation of the art for consideration of it merits***. No art or arguments were considered.

### 2.    Summary of the Remaining Prior Art

*Hirayama*

Hirayama describes additional implementation details for an active device applicable to Francisco's active device. Hirayama was not cited nor discussed in the prosecution leading to the '914 patent and thus raises a new question of patentability for claims 4 and 6 of the '914 patent.

*Okubora*

Okubora provides additional implementation details for a specific material, liquid crystalline polymer (LCP), included in the organic-based substrate in certain dependent claims of the '914 patent.

A related application to Okubora (U.S. Patent Publ. 2002/0195270) is cited on the second page of the '914 patent. This related application was not discussed by the Examiner during the prosecution. And Okubora is used here in combination with Francisco and JP466, which were not cited, and for the dependent claim feature of a specific material type.

Thus, Okubora's teachings—along with those of Francisco and JP466—present a substantial new question of patentability for claims 7-11 of the '914 patent.

### 3.    Discretionary Denial under 35 U.S.C. § 325(d) is not warranted.

Each SNQ in this Request meets the Patent Office's requirements for *ex parte* reexamination, and the Patent Office should _not_ exercise its discretion to deny this Request under 35 U.S.C. § 325(d). The SNQ determination required by 35 U.S.C. 303 should be made, reexamination should be ordered and, in due course, the claims should be rejected in view of each SNQ raised herein.

The SNQs raised (and Proposed Rejections 1-3) are each new and non-cumulative. A determination should issue under 35 U.S.C. 303 that SNQs have been raised based on Francisco and JP466 because the Proposed Rejections each present prior art and arguments that have never

been presented to, or considered by, the Patent Office or any Court.

Discretionary denial is not warranted.[5] As discussed above, neither Francisco nor JP466, which form the basis of each SNQ, have been considered by the Patent Office or any court. Therefore, this prior art is not "old art." *See* MPEP §§ 2216, 2242.II, 2258.01. Neither Francisco nor JP466 were cited or discussed during the prosecution leading to the '914 patent. And in the new bifurcated process, neither Francisco nor JP466 were presented to a merits panel for consideration with respect to the '914 patent. Instead, IPR2025-00383 was dismissed prior to any presentation of the art or arguments with respect to its merits, much less consideration of Francisco or JP466. *See* IPR2025-00383, Paper 14, p. 2 (noting the '914 patent "has been in force for more than 16 years, creating strong settled expectations for Patent Owner" and discretionarily denying the IPR.)

The disclosures of Francisco and JP466 are not cumulative to the art relied on during the prosecution of the '914 patent. As discussed above and detailed below, Francisco teaches positioning a first passive network and a second passive network at an input and output (respectively) of a (same) active device for multi-band operation. Thus, SNQs rely on technical teachings different from those that were discussed during the prosecution of the '914 patent—

---

[5] The Patent Office has stated that the *Becton Dickinson* and *Advanced Bionics* factors are not applicable to reexamination proceedings. *See In re Gordan F. Bremer*, Ex Parte Reexamination No. 90/013,808, at 25-27 (June 15, 2018) discussing *Advanced Bionics, LLC v. MED-Elektromedizinische Gerate GmbH*, No. IPR2019-01469, Paper 6 (PTAB Feb. 13, 2020), at 8-10 (precedential); *Becton Dickinson & Co. v. B. Braun Melsungen AG*, No. IPR2017-01586, Paper 8 (PTAB Dec. 15, 2017). Even if *Advanced Bionics* were to apply here, there was material error in not recognizing that dual-band LNAs with input and output networks at an active device were well-known in the art. *See* Background Facts #1-3.

namely Jensen's device having two separate LNAs for dual-band operation.

A consideration of the Office has, in some cases, been "whether Petitioner uses information gleaned from our earlier decisions to bolster challenges it advanced unsuccessfully." *In re Vivint Inc*, 14 F.4th 1342, 1353 (Fed. Cir. 2021). However, in this case, Requester has not used any information gleaned from earlier decisions as the Office has never considered the merits of unpatentability arguments for any claim of the '914 patent in any *inter partes* review or *ex parte* reexamination. The same or substantially the same art or arguments have never been considered by the Patent Office or any court, so there is no re-litigation of issues in this case.

Any co-pending *inter partes* review and *ex parte* reexamination can be managed by a stay. As discussed above, *inter partes* review of the '914 patent was discretionarily denied by the Acting Director under her new bifurcated process. As of the filing of this Request, the time to seek reconsideration or other review of that discretionary denial has not been exhausted. Once reexamination is ordered on the SNQs raised here, if IPR2025-00383 remains pending (or is eventually before the Office for review of its merits), there may be "good cause" to stay the *ex parte* proceeding. *See* 84 Fed. Reg. 16654 at 16656-57 (April 22, 2019) (explaining that "[g]ood cause for staying a case may exist if, for example, an on-going AIA proceeding, which is subject to statutory deadlines, is addressing the same or overlapping claims of a patent at issue in a parallel Office proceeding."). In this way, the Office's resources may be conserved while still meeting the statutory requirement for an SNQ determination under § 303 based on the substantial new questions of patentability raised by this Request. However, at this time, there is no ongoing AIA proceeding.

## III.  DETAILED EXPLANATION OF THE PERTINENCE AND MANNER OF APPLYING THE PRIOR ART REFERENCES TO EVERY CLAIM FOR WHICH REEXAMINATION IS REQUESTED

The proposed rejections detailed below show how claims 1-2 and 4-20 are unpatentable

and present an SNQ as discussed above:

| Proposed Rejection 1: | Claims 1-2, 5, and 12-20 are obvious under 35 U.S.C. § 103(a) over Francisco and JP466 |
|---|---|
| Proposed Rejection 2: | Claims 4 and 6 are obvious in view of Francisco, JP466 and Hirayama |
| Proposed Rejection 3: | Claims 7-11 are obvious over Francisco, JP466 and Okubora |

*See also*, Section III.D below, which discusses that any secondary considerations do ***not*** disturb findings of obviousness based on these proposed rejections.

### A.  Proposed Rejection 1: Claims 1-2, 5, and 12-20 are obvious under 35 U.S.C. § 103(a) over Francisco and JP466

#### 1.  Summary of Francisco (EX1005)

Francisco relates generally to "communications systems, and more particularly to those systems using amplifiers to transmit signals over multiple frequency bands." EX1005, 1:5-7. Driven by a need to improve "the multi-band radiotelephone, so that the circuit utilizes the space more efficiently, and is less expensive and more reliable," Francisco explains that "multiple prior-art amplifiers each handling communications with only one frequency band" can be replaced with a single multi-band amplifier. See EX1005, 1:42-46, 62-67. The single "multi-band amplifier in a communications system [is employed] to scale the signal level of a signal communicated over one of multiple frequency bands." EX1005, 1:50-53.

FIG. 1 illustrates system 100 including transmitter 101 and receiver 151 suitable for receiving multiple sets of frequency bands such as a cellular (~800 MHz) band and a PCS band (~1800 MHz). EX1005, FIG. 2, 1:11-24, 2:20-49, 7:45-52. The transmitter 101 includes a multi-band amplifier 115 and the receiver 151 includes a multi-band amplifier 155 to provide gain to the relevant signal. EX1005, FIG. 1, 3:41-47, 4:38-46; EX1003, ¶62 (explaining in a transmit circuit

the multi-band amplifier (115) is a power amplifier and in a receive circuit the multi-band amplifier (155) is a low-noise amplifier (LNA)).



multi-band LNA 155

multi-band power amplifier 115

**EX1005, FIG. 1 (annotated)**

FIG. 3 illustrates an amplifier structure 300 used for each multi-band amplifier—multi-band power amplifier (PA) 115 and multi-band LNA 155. EX1005, 5:24-29. Each of multi-band PA 115 and multi-band LNA 155 is "[a]dvantageous[]…with respect to its prior art counterpart, [] less expensively and bulky, and more reliable due to use of at least fewer [] amplifiers." EX1005, 3:66-4:2, 4:43-46 ("Like amplifier 115, LNA 155 **replaces two prior art LNAs** which would otherwise be employed to handle cellular receive signals and PCS receive signals separately")(emphasis added). The amplifier structure 300 includes field effect transistor (FET) 301 having a gate terminal connected to input matching network 310 and gate bias circuit 330 as

well as a drain terminal connected to drain bias circuit 340 and output matching network 350. EX1005, FIG. 3, 5:30-36.



**EX1005, FIG. 3**

### 2.    Summary of JP466 (EX1006)

Like Francisco, JP466 is directed to signal amplification "used in a communication equipment transmitter of a mobile phone, or the like." EX1006, [0001]. JP466 suggests implementing communication circuits such as its amplifier in a module, which can reduce the size of the passives and mitigate the generation of standing waves. EX1006, [0011]-[0022].

To form an amplifier (described in the context of a power amplifier), a dielectric substrate is used and its semiconductor amplifying element such as a FET is mounted directly on the substrate, while passive components such as "**a matching circuit**…[and] part of an FET bias circuit (resistor, capacitor)…and the like, are **arranged on each layer of the dielectric substrate**." EX1006, [0006]. The substrate, by using a dielectric material having a high relative permittivity εr, obtains an amplifier module in which the length of the conductor pattern is reduced,

the outer shape of the dielectric substrate is reduced, and electromagnetic coupling between patterns is suppressed. EX1006, [0018]-[0025].

JP466's dielectric substrate includes multiple, stacked dielectric substrates (11 to 15), which are also referred to as "layer[s]." EX1006, [0006], [0051]-[0053], FIG. 5. Passives such as resistors, capacitors, inductors and other impedance elements may be formed as conductor patterns on the surface of dielectric layers 11 to 15, thus embedded within the substrate 1. EX1006, [0053].



**EX1006, FIG. 5**

For example, conductor patterns 18 and 17 on a dielectric substrate/layers 13 and 12 form capacitors. *See* EX1006, [0054]-[0055], FIGS. 5-7. Likewise, strip lines in conductor pattern 20 form inductors on dielectric substrate/layer 15. *See* EX1006, [0057], FIGS. 5, 9. *See also*, EX1003, ¶¶65-70 (discussing JP466).

### 3.    Reasons to combine Francisco and JP466

A POSITA would have been motivated to combine the teachings of Francisco, which is silent as to the implementation and packaging configuration of its amplifier, with JP466's multilayer substrate having passive components (capacitors and inductors) formed in layers of its substrate that form matching and bias circuits coupled at inputs and outputs of an active device.

EX1003, ¶¶71-90. In particular, a POSITA would have been motivated to combine the teachings of Francisco and JP466 to produce the obvious, beneficial, and predictable results of utilizing JP466's substrate with embedded passive components to form a module implementing Francisco's amplifier circuit. *Id*. The module provides not only an implementation, but also a packaged configuration that benefits from size and performance as detailed below.

Francisco and JP466 are analogous art to the '914 patent because they are in the same field of endeavor, pertaining to the transmit and receive functionality of RF communication devices such as personal mobile phones. *See* EX1003, ¶72, EX1001, 1:29-47; EX1005, 1:11-25; EX1006, [0003]. In particular, each of Francisco, JP466 and the '914 patent are directed to an amplifier. EX1001, 2:14-16; EX1006, [0003]; EX1005, 1:5-61. Further, Francisco and JP466 are analogous art because each is directed to a same problem faced by the '914 patent's inventors—decreasing the size of RF devices. EX1006, [0007]-[0016]; EX1005, 1:42-46; EX1001, 1:58-62. And POSITA would have been motivated to combine the teachings of Francisco and JP466 for multiple reasons, as discussed below. EX1003, ¶¶73-85.

**First**, Francisco's amplifier is intended to be used in a system such as a mobile phone. Due to Francisco's silence, a POSITA, faced with a question of implementing Francisco's amplifier circuit for such an application, would readily turn to substantially similar RF devices and their implementation. A common technique for providing RF amplifier circuitry was a module. EX1003, ¶¶33-42, 73-74; EX1037, Abstract, [0002], [0073]. Implementation as a module as taught in JP466 was merely applying a "prevalent, perhaps even predominant, method" of performing a given task in the art. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1363 (Fed. Cir. 2013).

**Second**, POSITA would have been motivated to implement JP466's substrate, along with its teachings of embedding the passives within its substrate, in order to recognize a benefit of

reducing device size. EX1003, ¶¶75-77; EX1006, [0011], [0014], [0094]. There was a well-recognized motivation to decrease the size of the circuit, as well as the components thereof, when implementing an RF device. EX1003, ¶75 (citing EX1006, [0007], EX1005, 1:38-47). One common way to achieve this reduction was use of system-on-package (SoP) configurations typical in the industry prior to the '914 patent. EX1003, ¶75 (citing EX1025, p. 8 ("The ability to include components into the modules reduces the number of interconnects which increases reliability and reduces the size and the cost.")). As Francisco's amplifier includes multiple passive components, a POSITA would recognize that providing these components within the substrate of a module, as taught by JP466, reduces the need for separate, discrete passive components, which would take up additional area on the system board. EX1003, ¶¶74-75. This is merely implementing a known technique of embedding passive components in the substrate to provide to a benefit of efficient use of vertical space by positioning on the passives on multiple layers. *Id*. Providing passive components embedded in the substrate also reduces system assembly costs and system level planning. *Id*. (discussing rest of bill of materials (RBOM) cost reduction, planning, quality testing).

POSITA would also recognize a benefit of implementing JP466's teachings is allowing for a reduction in passive component size. EX1003, ¶¶75-76. JP466 describes benefits of decreasing the size of a passive (inductor) by embedding it within the substrate's dielectric. EX1006, [0064], [0070], [0075]; EX1003, ¶¶75-77 (explaining higher relative permittivity material impacts size).

**Third**, POSITA would have been motivated to implement JP466's teachings and the configuration of the passive components embedded therein for benefits electrical performance of the device. EX1003, ¶¶77-83. As discussed above, JP466's substrate provides dielectric material surrounding passives, which provides for efficient performance. *Id*. (discussing efficient signal transmission and preventing standing waves, EX1006, [0063], [0066]). Embedding components

within JP466's substrate material makes it possible for a "high Q value can also be acquired." EX1006, [0080]; EX1003, ¶81 (explaining high Q value means lower losses and better high frequency performance). Further, embedding passives allows for benefits to the system design process by reducing variables that would otherwise arise from interfaces with discrete components. EX1003, ¶82 (discussing tolerances for component placement, package variations citing EX1027).

**Fourth**, POSITA would have been motivated to implement JP466's teachings to achieve quality and reliability benefits of JP466's substrate material. EX1003, ¶84 (discussing weight, cracking, delamination benefits citing EX1028). JP466 teaches its substrate is less prone to cracking or delamination providing increased mechanical strength and reliability. EX1006, [0026], [0079].

In summary, a POSITA would have been motivated to apply JP466's teachings when implementing Francisco's amplifier because doing so would beneficially (1) provide details as to the implementation of Francisco's circuit suitable for its intended use in a communication system, (2) provide for a reduction in size of the RF device and components thereof, (3) provide benefits with respect to the electrical performance, and (4) provide a substrate quality that reduces delamination and cracking issues. EX1003, ¶85.

The results of combining Francisco's device with JP466's substrate would have been predictable and POSITA would have had a reasonable expectation of success given both Francisco and JP466 relate to similar device types performing the same function. EX1003, ¶¶86-90 (describing each amplifier with active device, matching circuit, bias circuits forming a circuit block citing EX1006, [0003]; EX1005, FIGS. 3, 4). Moreover, JP466's substrate configuration was common practice in RF devices. EX1003, ¶90 (citing EX1025; EX1029; EX1037 (illustrating organic substrate with embedded passives)). Requester discusses that any secondary

considerations the Patent Owner may raise should not disturb the obviousness of combining these known elements. *See* Section III.D below.

### 4. Claim 1

**[1.0]** *A multi-band RF device operable at a first frequency and a second frequency different from the first frequency, comprising:*

To the extent the preamble is limiting, Francisco discloses it. *See* EX1003, ¶¶91-103.

As discussed above, Francisco introduces a communication system 100, such as a portable radiotelephone for wireless communications over multiple frequency bands (*i.e.*, multi-band). EX1005, 2:19-26, 1:14-16. The communication system 100 includes an antenna coupled with transmitter and receiver, each including components of filters, oscillators, switches, and amplifiers to process RF signals at multiple bands. EX1005, 2:48-49, 2:63-3:55, FIG. 1; EX1003, ¶93 (discussing conventional transceiver building blocks). The system 100 operates "over **a first set of frequency bands** [e.g., cellular band], and a **second set of frequency** bands [e.g., PCS band]." EX1005, 2:20-26. *See also*, EX1005, FIG. 2, 2:27-47. These specific frequency bands are exemplary and not limited by Francisco. EX1005, 7:45-52. Thus, Francisco teaches a system, and RF devices therein as discussed below, *operable at a first frequency* (e.g., cellular band, ~800 MHz) and *a second frequency* (e.g., PCS band, ~1800MHz), which is *different from the first frequency*. EX1005, 1:10-25.

The amplifier structure 300 of FIG. 3 is *a multi-band RF device* implemented in the system 100 in both transmit and receive paths; the structure 300 receives and processes signals in each of multiple bands. EX1005, 5:23-29.



**EX1005, FIG. 3**
**(annotated)**

The amplifier structure 300, *a multi-band RF device*, operates at multiple frequencies as low noise amplifier (LNA) 155 in the receive path of the system 100, and in a second implementation, the amplifier structure 300, *a multi-band RF device*, operates at multiple frequencies as power amplifier 115 in the system's transmit path.[6] In each position, the amplifier is *operable* to achieve a designed gain to signals in *first* and *second frequency* bands and thus, is a *multi-band RF device*. EX1003, ¶99. Francisco explains that "unlike a prior art power amplifier which provides a desired gain to a signal within only a particular transmit band, amplifier 115

---

[6] POSITA understand low-noise amplifiers, *e.g.*, LNA 155, and power amplifiers, *e.g.*, PA 115, are used on the receive and transmit sides of transceivers, respectively. EX1003, ¶¶29-31, 62-64, 98. Both types of amplifiers perform a similar function, just in different places in the signal chain and do so with same structures though the value of the components may vary. *Id.*; EX1005, 5:23-6:7.

provides, in an efficient manner, a **desired gain to a signal within any one of the many discrete transmit bands**." EX1005, 3:56-62. *See also*, EX1005, 4:48-51 directed to LNA. An amplifier is the same device as described in '914 patent as one example of a *multi-band RF device*. *See* EX1001, dependent claim 4, 2:14-16 ("low noise amplifiers"), *see also*, 23:60-24:36.

FIG. 1 is illustrative of this system implementation of *multi-band RF device* discussed above:



**EX1005, FIG. 1 (annotated)**

*See also*, EX1005, 3:36-55.

Francisco explains the benefits of using each amplifier to produce signal gain at multiple bands is reduction in components in the multi-band system. "[A]mplifier 115 replaces two prior art power amplifiers which would otherwise be employed to handle signals within cellular Xmt band 201 and PCS Xmt band 205 separately. Advantageously, with multi-band power amplifier

115[,]…[system 100] is less expensive and bulky, and more reliability due to the use of at least fewer power amplifiers." EX1005, 3:62-4:2. *See also*, EX1005, 4:43-46. This is the same advantage recognized by the '914 patent. *See* EX1001, 2:8-16 ("in certain circumstances, can be reused at different frequency ranges, thereby reducing the number of components required.")

Thus, Francisco discloses the *multi-band RF device* of [1.0].

**[1.1]** *an active device;*

As discussed above, Francisco's amplifier structure 300 is a *multi-band RF device* and it includes field effect transistor (FET) 301, which is *an active device*. EX1003, ¶¶104-110. "As shown in FIG. 3, central to amplifier structure 300 is **field effect transistor (FET) 301**." EX1005, 5:30-31. This configuration of *an active device* is the same as the '914 patent. EX1001, 27:20-21 ("the active device is a field effect transistor"). The *active device* of Francisco also performs the same function of receiving a signal input from a passive network (*e.g.*, input matching network 310), producing gain and amplifying the signal, which is output to another passive network (*e.g.*, output matching network 350). EX1003, ¶¶107-109 (discussing transistor in circuit).



**EX1005, FIG. 3
(annotated)**

Thus, Francisco discloses *an active device* of [1.1].

**[1.2]** *a first passive network in communication with the active device, the first passive network comprising a first matching network at an input of the active device;*

Francisco's amplifier structure 300, *multi-band RF device*, includes *a first passive network* as recited in [1.2]. *See* EX1003, ¶¶111-122.

Francisco describes an "input matching network 310" and coupled "gate bias circuit 330" that together provide *a first passive network*. EX1005, FIG. 3, 5:31-40. This, like the '914 patent's similarly positioned passive network, is a network comprising inductors and capacitors and providing a matching functionality. EX1003, ¶112 citing EX1001, FIG. 35, 24:20-36.



*first passive network*

*active device*

**EX1005, FIG. 3
(annotated)**

The input matching network 310 and gate bias circuit 330, the *first passive network,* is *in communication with* FET 301, the *active device*. In particular, matching network 310 is connected to one of the FET terminals (*i.e.,* the gate). EX1003, ¶113; EX1005, FIG. 3, 5:32-34 ("**gate terminal** [of FET 301] is **connected** to **input matching network 310** coupled to **gate bias circuit 330**."), 5:44-45 ("Transmission line 319 **connects** both **capacitor 317** [of matching network 310] and circuit 330 to the **gate terminal of transistor 301**.") This connection provides *communication* of the input signal through the passive network to the FET 301. *Id.*

Francisco's *first passive network* comprises a *first matching network* of at least "input matching network 310." EX1005, 6:57-61, FIG. 3. A matching network refers to an impedance matching, which is also the function of Francisco's "input **matching** network 310" that "provides an optimum input **impedance match** over the multiple bands of interest (in this instance the

cellular and PCS transmit bands for amplifier 115, or the cellular and PCS receive bands for LNA 155)." EX1003, ¶114, EX1005, 6:57-61. *See also*, EX1005, 5:65-6:65 discussing the values of the passive networks for application as LNA 155 and PA 115.

The *first passive network*, including gate bias circuit 330 and matching network 310, is *at an input of the active device* illustrated (1) by the connection highlighted yellow in FIG. 3 above, (2) by Francisco's description of network 310 as an "**input** matching network," and (3) by a POSITA's understanding of functionality in the context of an amplifier. EX1003, ¶¶115-121 (discussing bias circuit setting quiescent point and matching network).

Thus, Francisco discloses the *first passive network* of [1.2].

**[1.3]** *a second passive network in communication with the active device, the second passive network comprising a second matching network at an output of the active device; and*

Francisco's amplifier structure 300, *a multi-band RF device*, discussed above includes a *second passive network* as in [1.3]. *See* EX1003, ¶¶123-131.

Francisco describes a "drain bias circuit 340" and "output matching [circuit] 350" that together provide a *second passive network*. EX1005, FIG. 3, 5:34-36. Francisco's network comprises inductors and capacitors and provides matching functionality, just as provided in the '914 patent. EX1003, ¶124 (citing EX1001, FIG. 35).

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,489,914



**EX1005, FIG. 3
(annotated)**

*first passive network*          *active device*          *second passive network*

The *second passive network*, including drain bias circuit 340 and output matching circuit 350, is *in communication* with the *active device* of [1.1], FET 301. EX1003, ¶125; EX1005, 5:34-36 ("The drain terminal of [FET 301] is **connected** to drain bias circuit 340 and also to output matching network 350."), 5:58-59 ("Transmission line 351 in network 350 **connects** the drain terminal of transistor 301 to capacitor 353 [of output matching network 350].") The connection is for communication of an output signal from the FET. EX1003, ¶125.

The *second passive network* comprises output matching circuit 350, which is a *second matching network*. Francisco describes "output **matching** network 350 provides an optimum output impedance match over the same bands [e.g., cellular and PCS]" and thus, provides a *second matching network*. EX1005, 6:61-63; EX1003, ¶126.

Francisco's *second passive network* of drain bias circuit 340 and output matching network 350 is *at an output of the active device* (FET 301) as illustrated (1) by highlighted yellow interconnection in FIG. 3, (2) by Francisco's description of an "**output** matching network," (EX1005, 6:12-20) and (3) by a POSITA's understanding of functionality of the network. EX1003, ¶¶127-130 (discussing purpose and components of Francisco's structure 300).

Thus, Francisco discloses *the second passive network* of [1.3].

**[1.4a]** *an organic-based substrate having at least two metal layers, wherein the two metal layers are patterned to form at least a portion of the first passive network and the second passive network,*

Francisco in view of JP466 renders obvious this element. *See* EX1003, ¶¶132-146.

As discussed, Francisco discloses implementing its amplifier structure 300, *multi-band RF device*, to provide multi-band functionality for "radiotelephones." EX1005, 1:25-45. The common way of providing circuit components for such an application is on a substrate that provides foundation material. EX1003, ¶¶75, 133, 33-42 (discussing modules and SoP). As discussed in the reasons to combine above, a POSITA would have reason to turn to the teachings of JP466, which describes a similar circuit, to implement the circuits of Francisco.

Just like Francisco, JP466 teaches an amplifier module including passive networks in communication with an active device (*e.g.*, a FET). EX1006, FIG. 3. JP466 details providing this amplifier on a substrate, which includes multiple, stacked layers ("a laminated dielectric substrate"), where passive network of the amplifier (*e.g.*, "matching circuit…bias circuit") are "arranged on each layer of the dielectric substrate" as a "conductor pattern." EX1006, [0006]. JP466's embedding passives as conductive patterns in a multi-layer dielectric substrate is a common technique. EX1003, ¶¶33-42, 90, 134-139 (citing EX1030; EX1025; EX1037 discussing passives formed on metal layers of package or module substrates).

JP466's FIG. 5 shows a cross-sectional view of an amplifier module having a dielectric substrate 1 and an active device of semiconductor chip 3 (*e.g.*, a FET). The dielectric substrate 1 has a stacked configuration including first to fifth dielectric substrates/layers 11 to 15 stacked.[7] EX1006, [0051]-[0052]. Each layer of substrate 1 (labeled 11-15) has a *metal layer*, shown by conductor patterns 16, 17, 18, 19, 20. EX1003, ¶136 (citing EX1006, FIGS. 6-9 showing patterns; EX1007; EX1025; EX1037 showing conductor patterns are metal). Thus, JP466's dielectric substrate 1 provides *at least two metal layers*.



**EX1006, FIG. 5**
**(annotated)**

JP466's conductor patterns (*at least two metal layers*) are *patterned to form at least a portion* of the passive networks of its amplifier. EX1006, [0053]-[0055]; EX1003, ¶¶137-138. One example is the *at least two metal layers* shown in FIGS. 6 and 7 that provide conductor patterns (17, 18) forming capacitors (C1 and C3) of the amplifier's passive networks.

---

[7] This is the same configuration as the '914 patent which states "[t]he term 'substrate'… consists of a multilayer stackup..." EX1001, 24:49-53.



*at least two metal layers patterned to form* passives (capacitors)

**EX1006, FIGS. 6 and 7
(annotated)**

Francisco's *first passive network* of [1.2] and *second passive network* of [1.3] include similar capacitors. EX1005, 5:38-40, 8:51-64, FIG. 3. Thus, a POSITA would have been motivated to form these substantially similar passives (capacitors) of Francisco using JP466's technique and thus provide *two metal layers patterned to form at least a portion of the first passive network and the second passive network* of Francisco. EX1003, ¶¶139-140.

As another example, JP466's FIG. 9 illustrates layer (15) of the substrate 1 having conductor pattern (20) (*metal layer*) *patterned* into strip lines 204, 205 and 206 forming another type of passive—inductors (L4, L5 and L6) of the amplifier's passive networks. EX1006, [0055], [0057], [0093].



*a metal layer patterned to* form a passive (inductor)

**EX1006, FIG. 9
(annotated)**

Like JP466's amplifier, Francisco's passive networks, see elements [1.2]-[1.3], also include inductance elements. EX1005, 5:40-64 (discussing inductors and transmission lines). Thus, a POSITA would have been motivated to form Francisco's passives (*e.g.*, inductors) using JP466's technique and thus, *two metal layers patterned to form at least a portion of the first passive network and the second passive network*. EX1003, ¶¶141-142 (describing inductors formed on a plurality of layers citing EX1024).

JP466 describes these examples as non-limiting. EX1006, [0053] ("There are no particular limitations to how the circuit components are arranged, but one possible example is shown below.") A POSITA would recognize that components of each of the passive networks of Francisco are readily formed using the plurality of metal layers available in JP466's substrate. EX1003, ¶142. In light of JP466's teachings, POSITA would have reasons to *form at least a portion of the first passive network and the second passive network* of Francisco, such as the capacitors and inductors of the biasing and matching networks, by providing a substrate *having at*

*least two metal layers, wherein the two metal layers are patterned to form at least a portion of the first passive network and the second passive network* as shown in JP466.



**EX1005, FIG. 3 and EX1006, FIG. 5 (annotated)**

JP466's dielectric substrate 1 discussed above is an *organic-based substrate*. JP466 describes that "[u]nlike conventional [substrates] formed using ceramic material," its substrate includes "**organic** resin material." EX1006, [0026], [0079]. JP466 describes an example of a polyvinyl benzyl ether compound, which is an organic material. EX1006, [0080]; EX1003, ¶144. In one example, JP466 describes polyvinyl benzyl ether compound (organic) is 70% by volume of a composite. EX1006, [0083]; EX1003, ¶144 citing EX1007, [0035] illustrating mixture including ceramic provides an organic substrate, EX1001, 11:1-4.

Thus, Francisco and JP466's disclosure of an organic substrate with passives formed on at least two metal layers, renders obvious [1.4a].

**[1.4b]** *wherein impedances of the first and second passive networks are different at the first frequency than the second frequency.*

Francisco discloses this element. EX1003, ¶¶147-172.

As discussed above, Francisco illustrates a multi-band amplifier 300, *multi-band RF device*, with *first and second passive networks* each comprising capacitors and at least one inductor. *See* [1.0]-[1.3]. And as detailed in [1.0], this amplifier is used to "scale the signal level of a signal communicated over one of multiple frequency bands." EX1005, 1:50-54.

> …the multi-band amplifier uses **an input network to achieve a selected input impedance**, and an **output network to achieve a selected output impedance**. The values of the input and output impedances are selected such that the **gain values afforded** by the multi-band amplifier to the components of the communication signal within the **multiple frequency bands** are significantly higher than the gain values to the signal components outside those bands.

EX1005, 1:53-61. Thus, Francisco's passive networks perform the same function as the '914 patent of minimizing noise and maximizing power gain over multiple frequency bands. EX1003, ¶149 (citing EX1001, 24:10-14; EX1005, 5:65-6:65). The *impedances of the first and second passive networks are different at the first frequency than the second frequency* as evidenced in at least three ways discussed below.

**First**, and most importantly, Francisco's passive networks are inductor-capacitor (LC) circuits and these circuits present different impedance to signals having different frequencies. EX1003, ¶148. This is a fundamental principle inherent in such circuits. Because signals at each of a first frequency and differing second frequency (*e.g.*, ~800 MHz and ~1800 MHz) are provided to Francisco's passive networks and because these passive networks are frequency-dependent LC

circuits, a POSITA would recognize that the impedances of the passive networks are necessarily different at different *first* and *second* frequencies. EX1003, ¶¶148-155 (defining impedance and explaining that impedance of inductors, capacitors, and LC circuits comprising inductors and capacitors varies with frequency; citing EX1014, 1:18-61 ("**Matching circuits** are widely used to transform the impedance of the various components within a circuit to a target impedance….**The impedances of the components and the matching circuits are frequency dependent**.")). In particular, Dr. Shoemake explains that capacitors and inductors contribute to reactance of a circuit and that reactance is a frequency dependent component of impedance. EX1003, ¶¶151-155.

Thus, the *first passive network* of Francisco, which includes capacitors and inductors, has a first impedance at a received *first frequency* (*f1*) and a second impedance at a received *second frequency* because impedance is a function of the frequency and has different values for different frequencies. *Id*. Similarly, the *second passive network* of Francisco, which includes capacitors and inductors, has a first impedance at a received *first frequency* (*f1*) and a second impedance at a received *second frequency* (*f2*), which is different from the impedance at the first frequency because impedance is a function of the frequency and has different values for different frequencies. *Id*.

**Second**, to the extent it is argued that this is not inherent in Francisco's circuitry, a POSITA would have had reason and motivation to select components of the *first passive network* and the *second passive network* such that the impedances of each of the first passive network and the second passive network are different at different frequencies. *See* EX1003, ¶¶156-177.  This is because the impedance of components that are matched by the first/second passive networks vary with frequency; therefore, to optimize performance at each frequency, a proper matching network

would also ensure different impedances by frequencies (i.e., like the component to which it is matching).

In particular, a POSITA desires to match the impedance with the subsequent component in the system, that is the function of the matching network. EX1003, ¶156. As the components to which the matching networks are matching have an impedance that varies with frequency, so too would a POSITA desire for the first passive network and the second passive network to provide different impedances at each of the first and second frequencies.[8] EX1003, ¶¶156-177. For example, Francisco's input matching network (*first passive network*) seeks to match source impedance of an upstream component to the input impedance of an amplifying transistor so as to minimize noise. Likewise, impedance matching in the output network involves configuring Francisco's *second passive network* (at transistor output) to present a load that is the conjugate of the transistor output impedance so as to match impedance, and thereby maximize power transfer, on each of the frequency bands. *See* EX1003, ¶¶166-167 (explaining Francisco's desire for an impedance over bands 203 and 207 corresponding to the complex conjugate of transistor output impedance and S22 parameter). Thus, to achieve the desired impedance matching in the *first*

---

[8] Francisco teaches this matching is performed by achieving the optimal amount of reflection ($\Gamma_{opt}$); this necessarily means that the input matching networks will have two different impedances at the two different frequencies to have the required reflection coefficients. EX1003, ¶¶156-177 (citing EX1031, a transistor datasheet illustrating $\Gamma_{opt}$ varies by frequency). Given Francisco's impedance matching in the input network to minimize noise involves optimizing, for each frequency band, signal reflection ($\Gamma$), which is a frequency dependent characteristic of the transistor, and that so-optimizing would cause POSITA to configure Francisco's *first passive network* (at transistor input) to provide a frequency dependent impedance given the known relationship between impedance and $\Gamma$. *Id.* (explaining Francisco's treatment of reflection to minimize noise in receiver bands 203 and 207 at transistor input).

*passive network* (at transistor input) and the *second passive network* (at transistor output), a POSITA would understand that impedances at the *first frequency* (first band) and the *second frequency* (second band) will necessarily be different to perform their matching functions.

**Third**, Francisco's FIG. 5 explicitly shows a multi-band power amplifier performance in a transmit role (*i.e.*, amplifier 115). EX1003, ¶¶178-180 (explaining FIG. 5's applicability to low-noise amplifier). The graph illustrates a difference in reflection coefficient between frequencies for the amplifier circuit. EX1005, 7:5-19.



**EX1005, FIG. 5**
**(annotated)**

A POSITA would understand FIG. 5 illustrates reduced (and different) return loss (501) at the input and reflection coefficients (503) at the output at the 850 MHz and 1.9 GHz bands and that gain (505) shaping presents local maxima around the 850 MHz and 1.9 GHz bands. EX1003, ¶¶179-180. These illustrated characteristics are further evidence that different impedances are

presented by the matching networks for the different frequency bands. EX1003, ¶180 (otherwise a POSITA would not expect to see the gain peak independently for the two different bands and the reflection coefficients also have local minimums).

Therefore, Francisco discloses [1.4b].

Thus, Francisco and its amplifier structure 300 in combination with JP466's disclosure of an organic-based substrate with embedded passives renders obvious claim 1.

### 5.    Claim 2

**[2.0]** *The multi-band RF device of claim 1, wherein the first and second passive networks comprise resonant circuits, and wherein the impedances of the first and second networks comprise reactance.*

Francisco and JP466 render obvious claim 1, and Francisco further teaches limitation [2.0]. *See* EX1003, ¶¶183-192.

As discussed in [1.2] and [1.3], Francisco provides *first* and *second passive networks*, each including inductors and capacitors. **First**, as a fundamental matter, inductors and capacitors are electronic components that contribute *reactance*, *i.e.*, the imaginary[9] component of a complex impedance, in an interconnected network of components that forms an electrical circuit. EX1003, ¶¶184, 152-153, 190-191. The presence of inductors and/or capacitors in the first and second passive networks of Francisco demonstrates that *impedances of the first and second networks comprise reactance. Id.*

---

[9] POSITA would have understood impedance ($Z$) to be mathematically expressed as a complex (real and imaginary number) quantity, $Z$ = R+jX, consisting of a real part (R), where R is the resistance, and an imaginary part (+jX or -jX), where X is the reactance. A positive reactance (+jX) corresponds to inductance while a negative reactance (-jX) corresponds to capacitance. EX1003, ¶¶184-185, 152-153.

Inductors and capacitors (LC) are the components that make a circuit resonant – they are *resonant circuits*. EX1003, ¶¶185-189 (explaining that a resonant circuit is a circuit that is designed to oscillate at one or more frequencies and that it is the inductive and capacitive components of a complex impedance that contribute to resonance). An LC circuit is generally considered resonant if the inductive and capacitive components balance each other resulting in maximum energy transfer or specific behavior such as amplification, oscillation, or selective filtering at a particular frequency, *i.e.*, a resonant frequency. *Id*. For example, a classical LC circuit will resonate when the inductance and capacitance sum to near zero. This condition occurs at an angular frequency of $\omega_0$, where $\omega_0 = \frac{1}{\sqrt{LC}}$, and $L$ and $C$ are reactive (inductive and capacitive) components of a complex impedance. *Id*.

Francisco describes its *first and second passive networks* in a way that makes it clear to a POSITA they form *resonant circuits*. EX1003, ¶¶185-189. Specifically, as a POSITA would recognize, to provide gain in a desired signal band, the reactance of an input matching network should cancel, thereby enabling the lowest power dissipation via resistance and oscillatory behavior between inductive and capacitive components in the network. *Id*. Thus, in Francisco's circuit, a POSITA would understand that the *first and second passive networks* (which respectively include input and output matching networks) are each designed to resonate in the two frequency bands for operation (pass bands) and to avoid resonance in the stop bands. *Id*. (explaining cellular and PCS bands in Francisco's design). Francisco's teaching of achieving conjugate source and load impedances for the transistor in an output (EX1005, 6:15-17) is a teaching of resonance for the pass bands in the *second passive network*. *Id*. (explaining the mathematics of resonance in an electrical circuit).

Moreover, for Francisco's *first passive network*, a POSITA would understand the input matching circuit is designed to resonate in the pass bands while also minimizing noise. EX1003, ¶¶187-190. Francisco's FIG. 5 (*see supra*, at [1.4b]) demonstrates local maxima in gain at both 900 MHz and 1.85 MHz and therefore that the *first passive network*, including its input matching circuit, like the *second passive network* is designed to resonate in the pass bands. These peaks indicate resonant behavior. *Id.* The fact reflections are low at the same frequencies also indicates resonance in the *first passive network*, including its input matching circuit, as the imaginary parts of the impedances are canceling and thus minimizing the overall impedance. *Id.*

Thus, the *first and second passive networks* of Francisco *comprise resonant circuits*, the *impedances* thereof *comprise reactance*, and Francisco in view of JP466 renders obvious claim 2.

### 6.    Claim 12

**[12.0] *The multi-band R[F] device of claim 1, wherein the active device is a field effect transistor.*[10]**

Francisco and JP466 render obvious claim 1, and Francisco also discloses this element. EX1003, ¶¶193-195.

As discussed in [1.1], Francisco discloses an *active device* that *is a field effect transistor*. "As shown in FIG. 3, central to amplifier structure 300 is **field effect transistor (FET) 301**." EX1005, 5:30-31. *See also*, EX1006, FIG. 3, [0003] ("FET"), [0006], [0032]. Thus, claim 12 is rendered obvious by Francisco and JP466.

---

[10] Various errors are provided in the claims of the '914 patent that raise indefinite issues; the claims are interpreted as best understood and indefiniteness is not addressed by this Request.

### 7.    Claim 13

**[13.0] *The multi-band RF device of claim 1, wherein the first passive network comprises a component embedded in the organic-based substrate.***

Francisco and JP466 render obvious claim 1, and the combination also renders obvious this element. *See* EX1003, ¶¶196-204.

As discussed in [1.4a], JP466 discloses an amplifier module with a dielectric substrate that is an *organic-based substrate*. EX1006, [0003], [0093]. JP466 illustrates *embedd[ing]* passives including capacitors and inductors of its amplifier's passive network within this organic-based substrate. That is, JP466 forms capacitors and inductors (each a *component*) in patterned conductor layers 16-20 (metal layers) disposed within a stack of dielectric layers 11-15 making up its substrate 1. *See* EX1006, FIG. 5, 6-9, [0053]. This is the same configuration as the '914 patent.[11]

The [1.4a] analysis further details exemplary passives (*e.g.*, capacitors and inductors) formed of these patterned conductor layers including, in one example, inductors (each *a component*) formed as conductor pattern 20, which is illustrative of a *component embedded in* the dielectric substrate 1, *the organic-based substrate*. EX1006, FIGS. 5, 9, [0051], [0057]; *see also* (conductor patterns 17, 18 forming capacitors (also each *a component embedded in the organic-based substrate*), [0055], FIGS. 5-7).

---

[11] EX1001, 24:49-53 ("The term 'substrate' in each of the above diagrams consists of a multilayer stackup…"), 24:64-68 ("FIGS. 38A-38F provide exemplary multi-layer stackups…The embedded passives can be of microstrip, stripline..."); EX1003, ¶199.



**EX1006, FIG. 5
(annotated)**

As discussed above, a POSITA would have had reason to, and recognized benefits of, forming components (capacitors and/or inductors/transmission lines) of Francisco's *first passive network* ([1.3]) using JP466's technique of patterned metal layers (*e.g.*, conductors 17, 18, 20) on a dielectric layer (*e.g.*, dielectric substrates 15-11) to *embed[]* the passive *component in the organic-based substrate*. *See also*, EX1003, ¶¶197-203 (discussing electrical field, signal leakage, trace length, foreign material benefits to embedding components).



**EX1005, FIG. 3
(annotated)**

**EX1006, FIG. 5
(annotated)**

JP466 explicitly recognizes advantages to forming an inductor *embedded* within the substrate including prevention of signal leakage to the outside and efficient signal transmission. EX1006, [0062]-[0068]. Further, "the use of a dielectric material with the high relative dielectric constant εr shortens the pattern length of the striplines 204, 205, and 206, which makes it possible to make the external form of the dielectric substrate smaller." EX1006, [0064]. A POSITA would recognize these same advantages in embedding a passive component of Francisco's *first passive network* within JP466's dielectric substrate 1, an *organic-based substrate*. EX1003, ¶202 (explaining "inductive choke 335" is an inductor and advantages of embedding passive components in high dielectric constant substrate).

Thus, claim 13 is rendered obvious by Francisco in view of JP466.

8.    **Claim 14**

**[14.0]** *The multi-band R[F] device of claim 1, wherein at least one of the metal layers is patterned to form at least a portion of a component included in the first passive network.*

Francisco and JP466 render obvious claim 1, and the combination also renders obvious this element. *See* EX1003, ¶¶205-208.

As discussed in [1.4a] and [13.0], JP466 teaches forming conductor patterns (16-20) that form component(s) of a passive network. One or more of these conductor patterns provides *at least one of the metal layers* that *is patterned*, to form at least *a portion of* a passive (*a component*) of a passive network. For the reasons discussed above, a POSITA would have had reason and recognized benefit to providing *at least a portion of a component* of Francisco's *first passive network* of [1.2] using JP466's technique.



EX1005, FIG. 3
(annotated)

EX1006, FIG. 5
(annotated)

In one example, JP466 describes conductor pattern 20, which is a *metal layer[] patterned* into strip lines forming inductors, which are *component[s]* of its passive network. EX1006, [0057]. Figure 9 is illustrative.



**EX1006, FIG. 9
(annotated)**

*See also*, EX1006, FIGS. 6-7 having conductor patterns 17, 18 forming capacitors of a passive network. It would have been obvious to form the similarly configured and functioned *component* (*e.g.*, capacitor and/or inductor/transmission line) of the *first passive network* of Francisco using JP466's technique for the reasons discussed in claim 1.

Thus, claim 14 is rendered obvious by Francisco and JP466.

### 9.    Claim 15

**[15.0] *The multi-band R[F] device of claim 1, wherein the second passive network comprises a component embedded in the organic-based substrate.***

Francisco and JP466 render obvious claim 1, and also this element. *See* EX1003, ¶¶209-212.

As discussed in [1.4a], [13.0], JP466 describes a dielectric substrate 1, an *organic-based substrate*, having conductor patterns *embedded* therein patterned to provide *a component* (*e.g.*, a passive) of its passive network. EX1006, [0093]. The analysis with respect to the first passive network ([13.0]) applies equally to the *second passive network*. That is, Francisco in view of JP466 discloses *a component* such as a capacitor or inductor of the *second passive network* ([1.3]) formed of a conductor layer *embedded* in JP466's organic-based substrate 1.



**EX1005, FIG. 3
(annotated)**

**EX1006, FIG. 5
(annotated)**

The position of the passives in the substrate is not limited to that illustrated in JP466 or annotated above. EX1003, ¶211 (describing possible substrate locations with respect to the drain terminal of the active device).

Thus, claim 15 is rendered obvious by Francisco in view of JP466.

### 10.   Claim 16

**[16.0]** *The multi-band R[F] device of claim 1, wherein at least one of the metal layers is patterned to form at least a portion of a component included in the second passive network.*

Francisco in view of JP466 renders obvious claim 1 and also this element. *See* EX1003, ¶¶206-209.

As discussed in [1.4a] and [14.0], JP466 suggests that *at least one of the metal layers*, illustrated by conductor patterns formed in its dielectric substrate 1, is *patterned to form* passive network components. As also described above, it would have been obvious to use JP466's technique to *form at least a portion of a component* (*e.g.*, inductor/transmission line or capacitor) of the *second passive network* of Francisco ([1.3]) by pattern[ing] one or more metal layers.



**EX1005, FIG. 3**
**(annotated)**

*second passive network*

*active device*

*metal layers*

*active device*

**EX1006, FIG. 5**
**(annotated)**

EX1003, ¶¶214-215 explains that the possible conductor pattern would be predictably located with respect to the drain of active device. The formation of the components of the *second passive network* is the same as those of the *first passive network* discussed above in claim 14.

Thus, claim 16 is rendered obvious by Francisco and JP466.

### 11.    Claim 5

**[5.0]** *A multi-band low noise amplifier for use in an RF application, comprising:*

To the extent this element is limiting, Francisco discloses it. *See* EX1003, ¶¶217-220.

Francisco's amplifier structure 300, as discussed in [1.0], implements "multi-band low noise amplifier (LNA) 155" of communication system 100 of Francisco, and thus is *a multi-band low noise amplifier*. EX1005, 4:28-32, 5:23-36. This communication system 100 uses the amplifier for *an RF application* as shown by its operation at first and second frequencies (*e.g.*, cellular and PCS frequency bands), also discussed in [1.0]. *See also*, EX1005, 1:11-24 (discussing "radiotelephone"); EX1003, ¶¶218-219 (citing EX1022 defining RF).

Thus, Francisco teaches [5.0].

**[5.1]** *an active device;*

Francisco discloses a transistor 301 of the multi-band amplifier structure 300 that provides *an active device* as shown in [1.1] and thus, discloses this element.

**[5.2]** *a first matching network in communication with the active device, wherein an impedance of the first matching network at a first frequency is different than the impedance of the first matching network at a second frequency;*

Francisco describes an "input matching network 310" that provides a *first matching network*. EX1005, 5:30-36; *see also*, [1.2]. Francisco labels this a "matching network" and describes its function as matching impedances of adjacent components. EX1005, 6:1-9, 6:26-56. *See also*, EX1003, ¶¶222, 114-121.



**EX1005, FIG. 3
(annotated)**

*first matching network*

*active device*

EX1003, ¶222. The input matching network 310 is *in communication* with the FET 301, the *active device*. EX1003, ¶223. In particular, the matching network 310 is connected to a gate terminal of the FET. EX1005, FIG. 3, 5:32-45. This connection provides for *communication* of a signal from the input matching network to the FET. EX1003, ¶¶223, 107-108, 113-121.

As discussed in [1.4b], the impedance of the input matching network is different at a *first frequency* (*e.g.*, cellular) than a *second frequency* (*e.g.*, PCS). EX1003, ¶¶224-225, 148-181. For example, Francisco explicitly states what POSITA would recognize—a desire to have the input matching circuit match the optimal reflection coefficient of the active device (transistor 301). EX1003, ¶¶148-181 (citing EX1031); EX1005, 5:65-6:19. Since the *first matching network* must match to two different reflection coefficients for the first and second frequencies, respectively, the impedance of the matching network must be different at the different frequencies. *Id.* (different matched coefficients, different impedance).

Thus, Francisco teaches this element.

**[5.3]** *a second matching network in communication with the active device, wherein an impedance of the second matching network at the first frequency is different than the impedance of the second matching network at the second frequency; and*

Francisco describes an "output matching network 350" that provides a *second matching network*. EX1005, 5:30-36. *See also*, [1.3]. Francisco labels this a "matching network" and describes its function of matching impedances of adjacent components. EX1005, 6:12-40. The output matching network *is in communication with* the FET 301, *the active device*, as shown by the connection in the architecture below and understood by the function of the network 350. EX1003, ¶¶227-228, 123-131.



**EX1005, FIG. 3**
**(annotated)**

As discussed in [1.4b], the impedance of Francisco's second matching network is different at a *first frequency* (*e.g.*, cellular) than a *second frequency* (*e.g.*, PCS). Dr. Shoemake explains that output impedance of the active device is related to S22 parameter of the transistor, which the ratio

of the reflected signal at the output of the transistor, which varies with frequency. EX1003, ¶¶229,

148-181. This means the output matching circuit must have different impedances with different

frequencies to provide suitable matching. *Id.*

Thus, Francisco teaches this element.

**[5.4a]** *a multi-layer organic-based substrate having at least one metal layer, wherein the first
matching network and the second matching are formed on the at least one metal layer and
wherein the active device is mounted on the multi-layer organic substrate,*

This element is indefinite as "the second matching" lacks proper antecedent basis. As best

understood, Francisco in view of JP466 teaches this element. [12]

**First**, as discussed in [1.4a], [14], [16], JP466 describes a substrate 1, *a multi-layer*

*organic-based substrate*, having *at least one metal layer* illustrated by conductor patterns 16-20,

where passives of matching networks are formed on the metal layer(s). As also discussed above,

it would have been obvious to form Francisco's passive components, including those of the *first*

*matching network* and the *second matching network*, on at least one of conductor patterns 16-20

(*at least one metal layer*) of JP466's substrate 1.

**Second**, JP466 describes "[t]he semiconductor amplifying element of FET, or the like, is

mounted directly on the dielectric substrate as a bare chip, or packaged using a resin mold and then

mounted on the dielectric substrate." EX1006, [0006]. The "chip 3" mounted on the multi-layer

organic substrate 1 in FIG. 5 is illustrative. *See also*, EX1006, [0052], [0060], FIGS. 4-5.

---

[12] Requester construes this claim to receive a *second matching network* for purposes of this

Request.



**EX1006, FIG. 5
(annotated)**

As JP466 illustrates forming FET configured as chip 3 mounted on the multi-layer organic substrate 1, it would have been obvious to implement the same configuration and form the similar FET 301 of Francisco, the *active device*, mounted on the multi-layer organic substrate. EX1003, ¶¶232-233. Mounting the active device on a multilayer organic substrate having embedded passives was common practice for an LNA. *See* EX1037, Abstract, [0037], [0073]-[0078]; FIGS. 5-6.

**[5.4b] *thereby allowing the an [sic] output of the multi-band low noise amplifier to have desired power gains at the first frequency and the second frequency based at least in part on each of the first and second matching networks having the different reactance at the first frequency and the second frequency.***

This claim portion is also indefinite and should be rejected as such, including not only the typographical error, but the recitation that the different reactance at the first frequency and the second frequency lacks particularly pointing out and distinctly claiming the intended scope as to what the difference is in comparison to.

Francisco teaches *allowing an output of the multi-band low noise amplifier to have desired power gains at the first frequency and the second frequency*. As discussed above ([1.0], [1.4b]),

Francisco illustrates a multi-band low noise amplifier (LNA) operable over multiple frequencies. An LNA operable over multiple frequencies means that it provides the *desired power gains* at each of the multiple frequencies as this is the LNA's function. EX1003, ¶¶234-236 (citing EX1005, 1:50-56 ("scale[s] the signal level of a signal communicated over one of multiple frequency bands.").

POSITA would have recognized Francisco's power gains are *based at least in part on each of the first and second matching networks having the different reactance at the first frequency and the second frequency*. This is because as a different first and second frequency bands are each provided to the first and second passive networks, it necessarily follows that the *reactance* of each of the passive networks is different at each frequency. EX1003, ¶¶234-236 (referring to analysis of [1.4b] and [2.0] which discusses Francisco teaching different impedances for different frequencies, the differing imaginary components of these different impedances being reactance).

Thus, claim 5 is rendered obvious by Francisco in view of the teachings of JP466 of embedding passive components in an organic-based substrate.

### 12.    Claim 17

**[17.0] *The multi-band amplifier of claim 5, wherein the first matching network comprises a component embedded in the organic-based substrate.***

Claim 5 is rendered obvious by Francisco and JP466, which also render obvious this claim. A POSITA would have applied JP466's teachings to Francisco's input matching network 310, *first matching network*, and formed *a component* (a passive) of Francisco's network on a metal layer (JP466's conductor pattern) *embedded* in JP466's organic-based substrate for the reasons discussed with reference to [1.4a], [13.0]. EX1006, FIGS. 5, 7-9. Thus, Francisco and JP466 render obvious claim 17.

### 13. Claim 18

**[18.0]** *The multi-band amplifier of claim 5, wherein at least one of the metal layers is patterned to form at least a portion of a component included in the first matching network.*

Claim 5 is rendered obvious by Francisco and JP466, which also renders obvious this claim. EX1003, ¶¶239-240. JP466 discloses *metal layers* of conductor patterns 16-20 that are *patterned to form at least a portion of a* passive (*component*) of matching network—a technique that would have been obvious to apply to a component of the input matching network 310 of Francisco, *the first matching network*, for the benefits of size, surrounding dielectric, quality, and reliability, as explained with reference to [1.4a], [14.0]. Thus, Francisco and JP466 render obvious claim 18.

### 14. Claim 19

**[19.0]** *The multi-band amplifier of claim 5, wherein the second matching network comprises a component embedded in the organic-based substrate.*

Claim 5 is rendered obvious by Francisco and JP466, which also renders obvious this claim. As discussed in [15.0], it would have been obvious to use JP466's technique of forming passive components using conductor patterns 17-20 of dielectric layers 12-15 of a substrate 1 to form components of output matching network 350 of Francisco, *the second matching network*. In doing so, passive components are *embedded* in substrate 1, an *organic-based substrate*. Thus, claim 19 is obvious in light of Francisco and JP466.

### 15. Claim 20

**[20.0]** *The multi-band amplifier of claim 5, wherein at least one of the metal layers is patterned to form at least a portion of a component included in the second matching network.*

Claim 5 is rendered obvious by Francisco and JP466, which also renders obvious this claim. As discussed in [16.0], it would have been obvious to use JP466's conductor patterns 16-20, which are *at least one of the metal layers patterned* to *form at least a portion of a component*

(passive) of the output matching network 350 of Francisco, *the second matching network*. Thus, claim 20 is obvious in light of Francisco and JP466.

### B.    Proposed Rejection 2: Claims 4 and 6 are obvious in view of Francisco, JP466 and Hirayama

#### 1.    Summary of Hirayama (EX1008)

Hirayama is directed to and describes circuits "which can be suitably applied to an amplifier circuit for a dual band" mobile terminal such as a mobile telephone. EX1008, (54), [0002], [0004]. Hirayama recognizes previous dual band implementations used "two amplifiers (i.e., transistors 1501 and 1502) which are matched according to [separate] frequencies[,]" which "increases the area of a chip, and further, induc[es] an increase in cost." EX1008, [0005]-[0006]. In contrast, with a goal of reducing cost and size, Hirayama's amplifier "can be used at two frequency bands" to "enable[] the impedance to be converted at both of the two frequencies." EX1008, [0007], [0071]. Hirayama describes its multi-band amplifier can "be applied to the case where an active element constituting the amplifier is either **a bipolar transistor or a field effect transistor** in the same manner, thus providing the matching circuit for converting the impedance into an optimum impedance at either of the two frequencies." EX1008, [0072].

#### 2.    Reasons to combine Francisco-JP466 and Hirayama

Reasons to combine JP466's teachings to implement Francisco's amplifier structure (Francisco-JP466) are detailed in Proposed Rejection 1. A POSITA would have been motivated to combine the teachings of Francisco-JP466 and Hirayama for multiple reasons, including to produce the obvious, beneficial, and predictable results of providing a bipolar junction transistor (BJT) as an active device of the amplifier of a RF communication system. EX1003, ¶¶245-258.

Francisco-JP466 and Hirayama are in the same field of endeavor as the '914 patent as they are related to RF devices suitable for personal communication devices, and further, each is directed

to amplifiers of that system. EX1008, [0004], [0002]; EX1005, 1:5-7, 1:36-46; EX1001, 1:23-27, 2:14-16. Not only are Francisco-JP466, Hirayama and '914 patent in the same field of endeavor, but they are reasonably pertinent to a problem faced by the inventor of the '914 patent of avoiding duplication of components for multi-band frequency systems through component reuse. EX1008, [0006]-[0007]; EX1001, 1:48-61, 2:8-13; EX1005, 1:25-46, 1:62-67.

Francisco and Hirayama describe a substantially similar RF device—a multi-band amplifier having a three-terminal active device (*i.e.*, a transistor) with passive components at its input and output, wherein the amplifier functions to obtain gain at multiple bands. EX1003, ¶252 (comparing Francisco's FIG. 3 and Hirayama's FIG. 1, each having an active device with a first terminal connected to an input network of passives, a second terminal connected to an output network of passives, and a third terminal connected to ground).



**EX1007, FIG. 1
(annotated)**

**EX1005, FIG. 3
(annotated)**

Employing a bipolar junction transistor (BJT) as suggested by Hirayama is merely applying a known technique (forming an active device of an amplifier as a BJT) to a substantially similar active device of a multi-band amplifier device (Francisco's amplifier structure 300) ready for improvement (*e.g.*, improvement in gain as discussed below). EX1003, ¶253; *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380–81 (Fed. Cir. 2023) ("[t]here is a motivation to combine

when a known technique 'has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way,' using the 'prior art elements according to their established functions.'")

The choice of the type of active device for RF devices was well-known to a system designer. EX1003, ¶¶254-256 (discussing personal experience with transistor selection, citing EX1017 discussing alternative transistors for amplifiers, and describing differing characteristics of transistors that provide the same fundamental operation). Hirayama itself recognizes that transistor type is a design option by suggesting that the active element of its amplifier can be a BJT or FET. EX1008, [0072], [0128].

A POSITA would recognize that there are only a limited number of choices for a transistor structure, with BJT and FET being two common choices. EX1003, ¶256. Implementations of amplifiers with bipolar junction transistors (BJT) were well-known. EX1003, ¶254 (citing EX1020 implementing BJTs in multi-band amplifiers). Moreover, for applications in which amplifier figures of merit, such as gain, noise figure and linearity, would have been important, a POSITA would have been motivated to choose a BJT. EX1003, ¶¶256-257 (noting higher gain, greater linearity, higher transition frequency advantages).

The results would have been predictable and there would have been a reasonable expectation of success in the combination because Francisco-JP466 and Hirayama describe similar amplifiers for use in similar systems. Any modification needed to the teachings of Francisco, including implementing changes to the passive networks, to accommodate the teachings of Hirayama, would have been within the level of ordinary skill in the art. EX1003, ¶258 (citing EX1005, 6:7-56 ("[t]he values of the individual components…can be readily determined by well-

known methods."), EX1017; EX1029). Moreover, Hirayama itself suggests the interchangeability of the transistors in an amplifier are well within the skills of POSITA. EX1008, [0128].

### 3.    Claim 4

**[4.0]** *The multi-band RF device of claim 1, wherein the active device is a bipolar junction transistor and wherein the multi-band device is a low noise amplifier operable for providing power gain at the first frequency and the second frequency.*

Francisco-JP466 renders obvious claim 1, and Francisco-JP466 further in view of Hirayama renders obvious this element. *See* EX1003, ¶¶259-265.

**First**, Francisco describes its active device broadly as "a transistor." EX1005, 8:8-9. While Francisco's specification discusses a field-effect transistor (FET) configuration, Francisco is not so limited. *See* EX1005, 8:11-54 (claim 1 broadly reciting "amplifying element," claim limiting to "a transistor," and claim 3 further narrowed to "a field effect transistor (FET).") Under a claim differentiation framework and a POSITA's understanding, Francisco does not limit the configuration of its transistor to a FET.

Further, as discussed above, it would have been obvious to provide the transistor of Francisco as a bipolar junction transistor (BJT) as shown in Hirayama. Hirayama describes that an amplifier can use an active device of a "bipolar transistor or a field effect transistor." EX1008, [0014]. In particular, Hirayama describes its techniques to allow operation of an amplifier at multiple frequencies "can be applied to the case where an active element constituting the amplifier is **either a bipolar transistor or a field effect transistor** in the same manner, thus providing the matching circuit for converting the impedance into an optimum impedance at either of the two frequencies." EX1008, [0072].

Hirayama suggests design trade-offs between gain performance and cost would motivate POSITA to use a BJT device in the amplifier: "The amplifier circuit of a **high gain** can be achieved in the **case of the use of the bipolar transistor** …The optimum device can be appropriately

selected according to the specifications required for the system." EX1008, [0128]. Thus, it would

have been obvious provide the active device of Francisco as a bipolar transistor as suggested by

Hirayama.



**EX1005, FIG. 3**
**(annotated)**

**EX1008, FIG. 1 (portion)**
**(annotated)**

EX1003, ¶263 (discussing a POSITA's approach to modifying circuit between FET and BJT with

respect to the matching network).

**Second**, as discussed in [1.0], Francisco teaches its amplifier structure 300 provides "multi-

band **low noise amplifier (LNA)** 155" in system 100. EX1005, 4:48-57, 5:24-29. The LNA 155

provides a *low noise amplifier* and is *operable for providing power gain at the first frequency and

the second frequency*. EX1005, 4:47-48 ("**multi-band LNA** 155 provides an appropriate **gain** to

the received signal."), 7:57-58. The referred-to gain is a *power gain* and, as discussed above, the

signals received by multi-band LNA 155 are of both the first and second frequency. EX1003, ¶264.

Thus, Francisco teaches that its amplifier structure operates as an LNA that receives and provides

power gain for both the *first frequency* (e.g., cellular) and the *second frequency* (e.g., PCS). *See*

*also*, EX1005, FIGS. 3, 5, 7:54-8:8, Abstract. And by applying Hirayama's BJT, the respective power gains can be increased. EX1003, ¶264.

Thus, Francisco, JP466 and Hirayama render obvious claim 4.

### 4.    Claim 6

**[6.0] *The multi-band amplifier of claim 5, wherein the active device is a bipolar junction transistor.***

Francisco-JP466 renders obvious claim 5, and in light of Hirayama's further teaching, it would have been obvious to implement Francisco's active device as a bipolar junction transistor as discussed above for [4.0].

Thus, claim 6 is rendered obvious by Francisco, JP466 and Hirayama.

### C.    Proposed Rejection 3: Claims 7-11 are obvious over Francisco, JP466 and Okubora

### 1.    Summary of Okubora (EX1007)

Okubora is entitled "[h]igh frequency module device and method for [its preparation]" and describes devices for electronic equipment such as portable telephones. EX1007, (54), [0001]. Okubora also recognizes that communication systems for such equipment are reliant on various high frequency bands. EX1007, [0002]-[0005]. When implementing RF transmission/reception circuits, Okubora recognizes challenges to using silicon and glass substrates and in response provides "a high frequency module in which a high precision passive elements or a high density wiring layer is formed on a base substrate formed of inexpensive organic resin to improve the function, as well as to reduce the thickness and size and to lower the production cost." EX1007, [0024].

Okubora illustrates a module that includes a high frequency integrated circuit (IC) 90 on core substrate 5, which also has a high frequency device layer 4 including first and second

insulating layers 30 and 31 with passives, such as an inductor 25, a capacitor 26 and a resistor 27. *See* EX1007, FIG. 7, [0059]-[0075] (method of fabricating in FIG. 8 with corresponding cross-sectional views in FIGS. 9-21).



**EX1007, FIG. 7**

The substrate, including core substrate 5 and layers 30 and 31 each are formed of a material of low dielectric constant and low tan δ (loss tangent). EX1007, [0035], [0048], [0054]; EX1003, ¶269 (explaining tan δ is a measure of the energy loss within a dielectric material, here substrate material, when used in an RF substrate). One of the preferred materials with low loss tangent suggested by Okubora is liquid crystal polymer (LCP). *Id*.

### 2.    Reasons to combine Francisco-JP466 and Okubora

Reasons to combine Francisco and JP466 are detailed in Proposed Rejection 1. A POSITA would have been motivated to combine Francisco-JP466 and the teachings of Okubora for multiple reasons, including to produce the obvious, beneficial, and predictable results of providing JP466's

insulating substrate of Francisco-JP466 device comprising liquid crystalline polymer (LCP). EX1003, ¶¶267-279.

Francisco-JP466 and Okubora are in the same field of endeavor as the '914 patent as they are related to transmit and receive circuits for RF devices suitable for personal communication, and in particular are directed to amplifiers and related passive components for those devices. EX1007, [0001]-[0006], FIG. 1; EX1005, 1:5-7, 1:36-46; EX1001, 1:23-27, 2:14-16. Like Francisco and JP466 discussed above, Okubora is also reasonably pertinent to a problem faced by the inventor of the '914 patent including reducing cost and size of packages of such devices. EX1001, 2:8-20, 24:37-46; EX1007, Abstract, [0006].

Francisco-JP466 and Okubora describe a substantially similar structure - RF transmit/receive circuitry having a core device (Francisco's amplifying element 101 or Okubora's IC 90) disposed on a multi-layer, organic insulating material substrate having passives (*e.g.*, resistors, capacitors, inductors) embedded *within* its organic layers. EX1003, ¶¶273-274 (comparing Okubora at FIG. 7 to JP466 at FIG. 5).



**EX1007, FIG. 1
(annotated)**

**EX1006, FIG. 5
(annotated)**

Providing JP466 dielectric substrate 1 with Okubora's dielectric material disclosed in a substantially similar module is merely implementing a known material to perform its known

function. EX1003, ¶275. Further, a POSITA would recognize that there are a limited number of choices for dielectric material, with LCP being a well-known choice for dielectric materials of substrates in general, and RF devices in particular. EX1003, ¶275 (citing LCP-based examples); EX1032, p. 503 ("LCP was introduced for multiplayer PCBs in 1995"); EX1023, p. 446 ("multilayer LCP"); EX1033, p. 249 ("LCP as a dielectric layer for the system-on-package process").

A POSITA would also have reason to implement the dielectric materials of Okubora to JP466's substrate due to LCP's advantageous qualities including ease of use and material properties. EX1003, ¶276 (citing EX1007, [0048] (discussing coating uniformity); EX1033, p. 249 ("LCP's have a high modulus, high melting temperatures, and good impact strength as a result of the fibrous nature of liquid crystal morphology."); EX1023, p. 444 (discussing impermeable characteristics)). LCP was also recognized as a cost conscious material choice. *Id.*

In summary, POSITA would have been motivated to apply Okubora's teachings when implementing the Francisco-JP466 device because doing so would beneficially (1) continue JP466's goal of providing an organic dielectric material suitable for embedding high-quality passive components; (2) provide material that allows to maintain coating uniformity or thickness controllability as discussed in Okubora ([0048]); (3) provide benefits of LCP including moisture resistance and (4) provide a low cost option. EX1003, ¶277. Each of these reasons separately and together would have motivated POSITA. *Id.*

The results would have been predictable and there would have been a reasonable expectation of success in the combination because Francisco-JP466 and Okubora describe similar devices for use in similar systems. EX1003, ¶¶278-279. JP466 describes an example using a polyvinyl benzyl ether compound as its organic resin material, which has a relative dielectric

constant between 2.5 and 3.5 and a dielectric loss tangent in the range of 0.0025 to 0.005 (EX1006, [0081].) The relative dielectric constant of LCP is similarly about 3.0 and the value of the loss tangent of LCP is below 0.0045. *See* EX1032, p. 507 (characterization of LCP). Further, Dr. Shoemake explains the advantages to embedding passives discussed above with respect to JP466 apply here as well. EX1003, ¶278 (inductor reduction benefits of JP466 maintained with LCP material of Okubora).

Any modification needed to the teachings of Francisco-JP466 to accommodate the teachings of Okubora's material would have been within the level of ordinary skill in the art. EX1003, ¶279 (citing JP466's non-limiting disclosure that "[t]he dielectric substrate is preferably made…"). And Okubora itself suggests the interchangeability of the suitable dielectric materials. EX1007, 20:11-23 ("an organic material, **such as** benzocyclobutene, polyimide…liquid crystal polymer…exhibiting high frequency characteristics, thermal resistance, resistance against chemicals, uniform coating characteristics and thickness controlling characteristics.") Okubora also illustrates the interchangeability of substrate materials including "liquid crystal polymer (LCP)" and "a mixture of ceramics with an organic substrate." EX1007, [0036].

### 3.    Claim 11

**[11.0] *The multi-band R[F] device of claim 1, wherein the organic-based substrate comprises liquid crystalline polymer.***

Francisco and JP466 render obvious claim 1, and Francisco-JP466 in view of Okubora render obvious this element. EX1003, ¶¶280-285.

As discussed in [1.4a], it would have been obvious to provide the multi-band RF device of Francisco using JP466's organic-based substrate. It would have also been obvious for that substrate to comprise a liquid crystalline polymer (LCP) in light of the teachings of Okubora. As discussed above in the reasons to combine Okubora above, LCP is a dielectric organic material known for

use in substrates including RF devices well before the '914 patent. Providing LCP as an organic, dielectric material in Francisco-JP466's substrate is a simple substitution of one exemplary organic dielectric material for another where the materials have similar properties and are described as performing similar functions as discussed above and below.

Okubora describes a multi-layer substrate including multiple layers comprising liquid crystalline polymer (LCP). In particular, Okubora's "core substrate 5 is comprised of…a low dielectric constant and low tanδ, that is of superior high frequency characteristics, such as…liquid crystal polymer (LCP)[.]" EX1007, [0035]. Okubora describes its insulating layers (30, 31) formed on this core substrate 5 also comprise LCP. EX1007, [0076], [0082]. Passive elements such as resistor 27, capacitor 26, and inductor 25 are formed on wiring layers on these LCP layers. EX1007, [0045]-[0056].



**EX1007, FIG. 7**
**(annotated)**

*See also*, EX1007, FIGS. 8-23. Thus, a POSITA would have recognized using LCP in Francisco-JP466's substrate for one or more of its layers (12, 13, 14, and/or 15), which are similarly

configured, have similar dielectric properties, also include patterned conductors forming passives thereon.

Thus, Francisco, JP466, and Okubora render obvious claim 11.

### 4.    Claim 7

**[7.0]** *The multi-band amplifier of claim 5, wherein the multi-layer organic-based substrate comprises at least one of hydrocarbon and liquid crystalline polymer.*

Francisco and JP466 render obvious claim 5, and Francisco-JP466 in view of Okubora renders this claim obvious. EX1003, ¶¶286-289.

As discussed in [5.4a], it would have been obvious to provide multi-band RF device of Francisco with an organic-based substrate as taught by JP466. JP466 provides an example of polyvinyl benzyl ether compound, which is a chlorinated hydrocarbon. EX1003, ¶287. To the extent this claim is met by the use of a hydrocarbon alone, it is rendered obvious by Francisco and JP466. *Id*.

Additionally, as discussed in [11.0], it would have been obvious for Francisco-JP466's substrate to comprise liquid crystalline polymer (LCP) in light of the teachings of Okubora. Thus, to the extent the claim requires <u>both</u> at least one a hydrocarbon and at least one LCP, it would have been obvious for the organic substrate to include a hydrocarbon **and** LCP. Okubora describes that multiple of its insulating compositions, including LCP, can be used together. *See* EX1007, 19:50-57 ("substrate formed of **one or more** materials selected from the group consisting of [hydrocarbons and **liquid crystal polymer**]."

Thus, claim 7 is obvious in light of Francisco, JP466 and Okubora.

### 5.    Claim 8

**[8.0]** ***The multi-band amplifier of claim 7, wherein the first matching network is positioned at an input of the multi-band amplifier and the second matching network is positioned at an output of the multi-band amplifier.***

Francisco-JP466 and Okubora renders obvious claim 7, and Francisco further discloses this element. EX1003, ¶¶290-293.

Francisco illustrates input matching circuit 310, *the first matching network* ([5.2]), *is positioned at an input of* amplifier structure 300 (*the multi-band amplifier*). EX1005, FIG. 3, 5:30-45. Francisco also illustrates output matching circuit 350, *the second matching network* ([5.3]), which *is positioned at an output of* amplifier structure 300 (*the multi-band amplifier*). EX1005, FIG. 3, 5:30-64.



EX1005, FIG. 3
(annotated)

Francisco confirms: "In accordance with the invention, the **multi-band amplifier** uses an **input network** to achieve a selected input impedance, and an **output network** to achieve a selected output impedance…." EX1005, 1:50-61.

Thus, claim 8 is rendered obvious by Francisco, JP466 and Okubora.

### 6.  Claim 9

**[9.0]** *The multi-band amplifier of claim 8, wherein the first matching network minimizes the noise figure for the multi-band amplifier at the input at both the first frequency and the second frequency.*

Claim 8 is rendered obvious by Francisco-JP466 and Okubora, and Francisco further discloses this element. EX1003, ¶¶294-296.

Francisco discloses that the amplifier structure 300 (FIG. 3), a *multi-band amplifier*, receives and amplifies signals at multiple frequencies including the first frequency (*e.g.*, cellular) and the second frequency (*e.g.*, PCS) as discussed in [1.0] and [5.0]. Input matching network 310, *the first matching network*, minimizes the noise figure at each of these frequencies: "In **LNA 155**, **input matching network 310** is synthesized such that…giv[es] **minimum noise in Rcv bands 203 [cellular] and 207 [PCS]**." EX1005, 6:1-7. *See also*, EX1003, ¶295.

Thus, claim 9 is rendered obvious by Francisco, JP466 and Okubora.

### 7.  Claim 10

**[10.0]** *The multi-band amplifier of claim 9, wherein the second matching network maximizes the desired power gains for the multi-band amplifier at the output at both the first frequency and the second frequency.*

Claim 9 is rendered obvious by Francisco-JP466-Okubora, and Francisco further discloses this element. EX1003, ¶¶297-300.

Francisco teaches that its multi-band amplifier, illustrated by amplifier structure 300 of FIG. 3, receives and amplifies signals at multiple frequencies including the *first frequency* (e.g.,

cellular) and the *second frequency* (e.g., PCS) as discussed in [1.0] and [5.0]. Output matching network 350, *the second matching network*, maximizes the desired power gains at each of these frequencies. A POSITA would recognize this to be the function of amplifier structure 300. EX1003, ¶298. Francisco explicitly describes this: "…unlike a prior art power amplifier which provides a **desired gain** to a signal within only a particular transmit band, amplifier 115 provides, in an efficient manner, **a desired gain** to a signal within **any one of the many discrete transmit bands**." EX1005, 3:56-62, *see also*, 3:62-4:2. Francisco also confirms this is the function of the LNA 155 "…received signal, either a **cellular receive signal or PCS receive signal**, to multi-band low-noise amplifier (LNA) 155…[which receives cellular signals and PCS signals and provides] an **appropriate gain** to the **received signal**." EX1005, 4:38-48.

Francisco also explicitly suggests *maximiz[ing]* power gains: "The **maximum power transfer** in the multiple bands of interest is thus achieved by amplifier structure 300 in accordance with the invention." EX1005, 6:63-65.

Thus, claim 10 is rendered obvious by Francisco, JP466 and Okubora.

### D. Secondary Considerations related to the obviousness of the Challenged Claims

There is no evidence in the record of objective indicia of non-obviousness at the time of filing this Request. Any evidence that the Patent Owner may raise during this proceeding must be considered in the context of the strength of the obviousness positions presented in the proposed rejections. S*ee, e.g., Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372, 82 USPQ2d 1321, 1339 (Fed. Cir. 2007) ("the record establish[ed] such a **strong case of obviousness**" that allegedly unexpectedly superior results were **ultimately insufficient** to overcome obviousness conclusion); *Leapfrog Enterprises Inc. v. Fisher-Price Inc.*, 485 F.3d 1157, 1162, 82 USPQ2d 1687, 1692 (Fed. Cir. 2007) ("**given the strength of the prima facie obviousness showing, the evidence on**

secondary considerations was inadequate to overcome a final conclusion" of obviousness);
MPEP 2145. (Emphasis added). In light of the overly broad claims of the '914 patent reciting well-
known circuitry and substrate configurations, any later-submitted evidence surely is outweighed
by the strength of the obviousness positions above.

Further, to be probative, any later-proffered evidence would need to be commensurate with
the scope of the claimed invention. The challenged independent claims recite merely conventional
circuitry with passives formed on an ***organic-based substrate***. The few dependent claims that
recite liquid crystalline polymer (LCP) do so only in an alternative framework (see claims 7-10),
except for dependent claim 11 that does require LCP. But even this claim only recites that the
organic-based substrate comprises—an open-ended term—liquid crystalline polymer (LCP) in
some unspecified context. Thus, any of Patent Owner's later-submitted "evidence" drawn to LCP
is ***not*** commensurate with the claims and their expansive application to all *other* organic materials.
And therefore, any LCP-framed evidence should be discounted accordingly. *See in re Grasselli*,
713 F.2d 731, 743, 218 USPQ 769, 778 (Fed. Cir. 1983) (evidence of superior properties for
sodium containing composition insufficient to establish the non-obviousness of broad claims for a
catalyst with "an alkali metal" where it was well known in the catalyst art that different alkali
metals were not interchangeable and applicant had shown unexpected results only for sodium
containing materials); *in re Greenfield*, 571 F.2d 1185, 1189, 197 USPQ 227, 230 (CCPA 1978)
(evidence of superior properties in one species insufficient to establish the nonobviousness of a
subgenus containing hundreds of compounds).

In other proceedings, the Patent Owner has indicated that it intended to present secondary
considerations of non-obviousness based on an allegation of copying by the Requester. *See*
IPR2025-00383, Paper 9, p. 23. Requester did ***not*** copy the '914 patent or any technology of the

Patent Owner. As illustrated above, use of organic-based substrates—including LCP—was known long before the '914 patent. This is evidenced not just by JP466 and Okubora as discussed above, but various other disclosures.[13] In fact, Requester's own patents recognized that LCP could be implemented for substrates and packaging RF devices before the '914 patent. *See*, *e.g.*, Requester's patents including U.S. Patent Nos. 6,420,818 (EX1039); 6,965,680 (EX1040); JP2003229304 (EX1041) each mentioning LCP prior to the '914 patent's earliest priority date. Simply put, Patent Owner's technology in '914 patent presented nothing to "copy" as Requester and the industry already had knowledge of all of the features of its claims before the '914 patent's earliest priority date. *See*, *e.g.*, *Vandenberg v. Dairy Equipment Co.*, 740 F.2d 1560, 1568, 224 USPQ 195, 199 (Fed. Cir. 1984) (evidence of copying not found persuasive of nonobviousness because the basic concepts of a plastic support device using a ball and socket joint were developed prior to learning of their competitor's device).

Similarly, there is and can be no evidence that Requester failed to develop the technology of the '914 patent. Requester's technology and products are different than the '914 patent claims. Requester expended extensive resources to develop its *own* substrate technologies introducing various technologies when the market, technology, and manufacturability were appropriately

---

[13] *See, e.g.*, Background Fact #5 and discussing LCP: EX1032 "Characterization of Liquid Crystal Polymer for High Frequency System-in-a-Package Applications" (2002), p. 503 ("LCP was introduced for multi[]layer PCBs in 1995") and throughout recognizing LCP for high frequency use due to its relative dielectric constant and loss tangent; EX1023 "RF Characterization of a Low Cost Multichip Packaging Technology for Monolithic Microwave and Millimeter Wave Integrated Circuits," (1995), including "multilayer LCP"; EX1033 "Liquid crystal polymers (LCP) for high performance SOP applications," (2002), pp. 249-253 ("LCP as a dielectric layer for system-on-package process").

developed.  In one aspect of its development efforts, Requester worked with Primatec, a company that had substrate know-how including use of the organic material liquid crystalline polymer (LCP) that extended before that of '914 patent. *See*, *e.g.*, EX1038 (Primatec's EP1375112A2 having a priority date of 2002). Further, any commercial success of any of Requester's products is due to various factors, including nontechnical factors such as Requester's significant history, brand name, marketing, and/or distribution network. *See e.g., Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006) ("Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success.").

The bottom line is all of the elements of the '914 patent claims were well-known in the art. Not only would any evidence the Patent Owner may attempt to present in this proceeding not overcome the strong obviousness rejections here, if the features relied upon are well-known in the art, as they are here, evidence directed to them is not pertinent. *Ormco Corp.*, 463 F.3d at 1312 ("[I]f the commercial success is due to an unclaimed feature of the device, the commercial success is irrelevant. **So too if the feature that creates the commercial success was known in the prior art, the success is not pertinent**." (footnoted omitted))

## IV.  LIST OF EXHIBITS

| EX1001 | U.S. Patent No. 7,489,914 |
|---|---|
| EX1002 | Prosecution History of U.S. Patent No. 7,489,914 |
| EX1003 | Declaration of Matthew B. Shoemake under 37 C.F.R. § 1.68 |
| EX1004 | *Curriculum Vitae* of Matthew B Shoemake |
| EX1005 | U.S. Patent No. 6,128,508 ("Francisco") |
| EX1006 | JP 2001-267466 ("JP466") including original Japanese language document, English translation, and Translator's certification |
| EX1007 | European Patent Application EP 1 189 345 A2 ("Okubora") |
| EX1008 | U.S. Patent Application Publication No. 2002/0118067 ("Hirayama") |
| EX1012 | *Fundamentals of Microsystems Packaging*, Rao Tummala, McGraw-Hill, Table of Contents and Chapter 11, 2001 |
| EX1014 | U.S. Patent No. 6,825,818 |
| EX1015 | U.S. Patent No. 5,457,734 |
| EX1016 | U.S. Patent No. 5,406,615 |
| EX1017 | *RF Microelectronics*, Behzad Razavi, Prentice Hall PTR, 1998 |
| EX1018 | U.S. Patent No. 5,821,820 |
| EX1020 | European Patent Application Publication No. EP 0 851 576 A2 |
| EX1021 | A CMOS RF Bandpass Low Noise Amplifier for Multi-band Wireless Communication Applications, Mou et al., IEEE, 2002 |
| EX1022 | *The Wiley Electrical and Electronics Dictionary*, Steven M. Kaplan, 2004, pp. 628, 662, 630 |
| EX1023 | RF Characterization of a low cost multichip packaging technology for monolithic microwave and millimeter wave integrated circuits, Jayaraj et al., IEEE, 1995 |
| EX1024 | JP 2001345648 ("JP648") including original Japanese language document, |

| | |
|---|---|
| | English translation, and Translator's certification |
| EX1025 | NIST Technical Note 1520, "Dielectric and Conductor-Loss Characterization and Measurements on Electronic Packaging Materials, 2001 |
| EX1026 | US Patent Application Publication No. 2004/0127182 |
| EX1027 | Embedded Passives Technology Implementation in RF Applications, Savic, et al., IPC Printed Circuits Expo, 2002 |
| EX1028 | US Patent Application Publication No. 2004/0113719 |
| EX1029 | US Patent Application Publication No. 2003/0063427 |
| EX1030 | *Microwave Engineering Second Edition* by David M. Pozar, Wiley, 1998 |
| EX1031 | Datasheet NE38018, NEC, 2000 |
| EX1032 | Characterization of Liquid Crystal Polymer for High Frequency System-in-a-Package Applications, Zou et al., IEEE Transactions On Advanced Packaging, Vol. 25, No. 4, 2002 |
| EX1033 | Liquid Crystal Polymers (LCP) for High Performance SOP Applications, 2002 Proceedings. 8th International Advanced Packaging Materials Symposium (Cat. No.02TH8617), Stone Mountain, GA, USA, 2002 |
| EX1034 | *Microwave Transistor Amplifiers Analysis and Design*, Second Edition, Guillermo Gonzalez, Wiley, 1997 |
| EX1037 | JPA H06-97315 including original Japanese language document, English translation, and Translator's certification |
| EX1038 | EP1375112A2 |
| EX1039 | U.S. Patent No. 6,420,818 |
| EX1040 | U.S. Patent No. 6,965,680 |
| EX1041 | JP2003229304 |

## V.    CONCLUSION

For the reasons set forth above, substantial new questions of patentability are raised in connection with claims 1-2 and 4-20 by this request for *ex parte* reexamination because such claims are rendered obvious in view of the above-listed prior art references. Therefore, Requester asks that this request for reexamination be granted and that claims 1-2 and 4-20 be canceled.

As identified in the attached Certificate of Service and in accordance with 37 C.F.R. §§ 1.33(c) and 1.510(b)(5), a copy of the present request, in its entirety, is being served to the address of the attorney or agent of record.

Please direct all correspondence in this matter to the undersigned.

Respectfully submitted,

*[David W. O'Brien]*
David W. OBrien, Reg. No. 40,107
Counsel for Third Party Requester

Dated:  August 8, 2025
HAYNES AND BOONE, LLP
Customer No. 27683
Telephone:
Facsimile: 214/200-0853
Attorney Docket No.: 0049195.00030US03

## VI.   CERTIFICATE OF SERVICE

The undersigned certifies that copies of the following,

> (1) Request for Ex Parte Reexamination Transmittal Form;
>
> (2) Request for Ex Parte Reexamination Under 35 USC §§ 302-306;
>
> (3) PTO 1449 Modified Form; and
>
> (4) Exhibits: EX1001-EX1008, EX1012, EX1014-EX1018, EX1020-EX1034, EX1037-EX1041.

in their entirety were served on:

> Thomas | Horstemeyer, LLP
> 3200 Windy Hill Road, Se
> Suite 1600E
> Atlanta, GA 30339
>
> Warren J. Thomas
> Meunier Carlin & Curfman LLC
> 999 Peachtree Street NE, Suite 1300
> Atlanta, GA 30309

the attorney of record for the assignee of U.S. Patent No. 7,489,914, in accordance with 37

C.F.R. § 1.510(b)(5), on August 8, 2025.



*[David W. OBrien]*
David W. OBrien, Reg. No. 40,107
Counsel for Third Party Requester